[No. D040421. Fourth Dist., Div. One. Nov. 20, 2003.]

ROBERT BARBEE, Plaintiff and Appellant, v.
HOUSEHOLD AUTOMOTIVE FINANCE CORPORATION, Defendant and
Respondent.

COUNSEL

Strauss & Asher, David P. Strauss and Mark A. Bennett for Plaintiff and Appellant.

Heller Ehrman White & McAuliffe, Robert W. Bell, Jr., and Erin Downey Booth for Defendant and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

Appellant Robert Barbee appeals from a summary judgment order entered in favor of defendant Household Automotive Finance Corporation (HAFC). Barbee contends the trial court erred in concluding that HAFC's termination of his employment for dating a subordinate neither invaded his right to privacy guaranteed by article I, section 1 of the California Constitution nor violated the public policy expressed in Labor Code section 96, subdivision (k). We affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Barbee was the national sales manager for HAFC and was responsible for leading HAFC's entire sales force. In October 2000, Barbee began dating

Melanie Tomita, a member of HAFC's sales force. The chief executive officer of HAFC, John Vella, became aware of rumors that Barbee was dating someone within the sales force. During December 2000, Vella informed Barbee that "intercompany dating was a bad idea."

HAFC has a conflict of interest policy that provides in relevant part: "Situations of relationships between employees may . . . cause a conflict of interest. If a consensual intimate relationship between a supervisor and any employee within that supervisor's direct or indirect area of responsibility is desired, it is the supervisor's responsibility to bring this to management's attention for appropriate action (i.e., possible reassignment to avoid a conflict of interest)."

In March 2001, Barbee met with Vella and Pat Boney, HAFC's national director of human resources. Barbee was asked about the nature of his relationship with Tomita. Barbee replied that he had a "special relationship" with her and that they were very good friends. Boney told Barbee that such a relationship created a potential conflict of interest and that Barbee would have to end the relationship or, in the alternative, either Barbee or Tomita could resign. Boney said that he would let Barbee consider his options over the weekend.

The following Monday Barbee informed Vella and Boney that both he and Tomita wanted to stay with HAFC. Barbee conceded that based on this conversation, Vella and Boney "probably assumed" he was agreeing to end his relationship with Tomita. Not long after that meeting, an HAFC customer called Barbee and offered him tickets to the National Collegiate Athletic Association regional semifinal and final basketball games. Barbee asked Tomita's fellow sales representative, who was at the customer's office at the time, to pick up the tickets for him. Barbee attended the games with Tomita. Boney and Vella later asked Barbee whether he had attended the games with Tomita, and Barbee admitted that he had. Soon thereafter, Vella and Boney terminated Barbee's employment.

Barbee filed this action alleging invasion of privacy, wrongful termination in violation of public policy, and sex discrimination. HAFC moved for summary judgment as to the entire action or, in the alternative, summary adjudication on each of the three causes of action. Barbee opposed HAFC's motion as to the invasion of privacy and wrongful termination causes of action. The trial court granted HAFC's motion for summary judgment and entered judgment in favor of HAFC. Barbee timely appealed.[1]

---

[1] Barbee conceded the appropriateness of HAFC's motion for summary adjudication with respect to his sex discrimination claim and does not challenge the trial court's judgment with respect to that cause of action in this court.

## III.

## DISCUSSION

### A. *Standard of Review*

█ Pursuant to Code of Civil Procedure section 437c, subdivision (c), summary judgment is proper where the papers submitted demonstrate that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. On appeal, our review is de novo. (*Thunderburk v. United Food & Commercial Workers' Union* (2001) 92 Cal.App.4th 1332, 1337 [112 Cal.Rptr.2d 609].)

### B. *HAFC's Termination of Barbee's Employment Did Not Invade His Right to Privacy Under Article I, Section 1 of the California Constitution*

Barbee claims that HAFC's termination of his employment based on his relationship with Tomita violated his right to privacy under article I, section 1 of the California Constitution.

Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy.*" (Italics added.)

"[A]rticle I, section 1 of the California Constitution creates a right of action against private as well as government entities." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15–20 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*).) " 'The constitutional provision is self-executing; hence, it confers a judicial right of action on all Californians. [Citations.] Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.' " (*Id.* at p. 18, quoting *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839].)

"[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy." (*Hill, supra,* 7 Cal.4th at pp. 39–40.)

### 1. *A Legally Protected Privacy Interest*

Barbee argues that he has a legally protected privacy interest in pursuing an "intimate relationship." By using the phrase "intimate relationship," and

arguing that his right to privacy under article I, section 1 protects the "sexual lives of the unmarried" (*Barrenda L. v. Superior Court* (1998) 65 Cal.App.4th 794, 800 [76 Cal.Rptr.2d 727]), Barbee appears to contend that he has a legally protected privacy interest in pursuing a sexual relationship with Tomita.

Barbee has not cited, and we have not found, any California cases that have directly addressed whether a person has a privacy interest in pursuing an intimate relationship under the state constitutional right to privacy. The cases on which Barbee relies involve primarily the right to be free from intrusive questioning regarding one's sexual activities. (See *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1567 [50 Cal.Rptr.2d 399]; *Barrenda L. v. Superior Court, supra,* 65 Cal.App.4th at p. 800.) None stand for the proposition that individuals have a legally protected privacy interest in pursuing sexual relationships pursuant to the state constitutional right to privacy.

In *Lawrence v. Texas* (2003), 539 U.S. 558 [156 L.Ed.2d 508, 123 S.Ct. 2472] (*Lawrence*), the United States Supreme Court held that a statute that prohibited sodomy between persons of the same sex violated the due process clause of the United States Constitution. The court expressly stated that a prohibition on sodomy that applied to both same sex and different sex participants would also be invalid. (*Lawrence,* at p. 2482.) The *Lawrence* court also wrote that the statute at issue in that case was unconstitutional because "the State cannot demean [the petitioners'] existence or control their destiny by making their private sexual conduct a crime." (*Id.* at p. 2484.) In reaching its holding, the *Lawrence* court stated: " '[I]ndividual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty" protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.' " (*Lawrence, supra,* 539 U.S. 558 [123 S.Ct. at pp. 2483–2484], quoting *Bowers v. Hardwick* (1986) 478 U.S. 186, 216 [92 L.Ed.2d 140, 106 S.Ct. 2841], [Stevens, J., dissenting], footnotes and citations omitted.)

The "state constitutional right [to privacy] provides protection that is distinct from, and in some respects greater than, that provided by the federal Constitution . . . ." (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 630 [42 Cal.Rptr.2d 50, 896 P.2d 776].) Accordingly, in the wake of *Lawrence,* Barbee may have a legally protected privacy interest in pursuing an intimate or sexual relationship, guaranteed by article I, section 1 of the California Constitution. However, although we make this assumption for purposes of the analysis of this case, we need not resolve this issue because, as discussed below, Barbee cannot establish the second necessary

element of his invasion of privacy claim that he had a reasonable expectation of privacy in the circumstances of this case.

## 2. *A Reasonable Expectation of Privacy in the Circumstances*

Barbee argues that he had a "reasonable expectation of privacy in his relationship with Tomita."

" 'The extent of [a privacy] interest is not independent of the circumstances.' [Citation.] Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. For example, advance notice of an impending action may serve to ' "limit [an] intrusion upon personal dignity and security" ' that would otherwise be regarded as serious. [Citation.] In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. [Citations.] A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. [Citation.]" (*Hill, supra,* 7 Cal.4th at pp. 36–37.)

HAFC has cited numerous cases in which courts have approved of restrictions on intimate relationships between employees of an organization or entity where such relationships presented potential conflicts of interest within the organization. (See, e.g., *Crosier v. United Parcel Service* (1983) 150 Cal.App.3d 1132 [198 Cal.Rptr. 361] (*Crosier*), disapproved on other grounds by *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 700, fn. 42 [254 Cal.Rptr. 211, 765 P.2d 373]; *Parks v. City of Warner Robins, Ga.* (11th Cir. 1995) 43 F.3d 609; *Waters v. Gaston County, N.C.* (4th Cir. 1995) 57 F.3d 422; *Parsons v. County of Del Norte* (9th Cir. 1984) 728 F.2d 1234.) ■ The fact that courts have recognized that employers have legitimate interests in "avoiding conflicts of interest between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; [and] preventing family conflicts from affecting the workplace" strongly suggests that a supervisor has no reasonable expectation of privacy in pursuing an intimate relationship with a subordinate. (*Parks, supra,* 43 F.3d at p. 615.) Courts have also recognized that managerial-subordinate relationships present issues of potential sexual harassment. (*Crosier, supra,* 150 Cal.App.3d at p. 1140 [concluding employers are "legitimately concerned with . . . possible claims of sexual harassment . . . created by romantic relationships between management and nonmanagement employees"]; see *Holly D. v. California Institute of Technology* (9th Cir. 2003) 339 F.3d 1158 ["a plaintiff who contends she was coerced into performing unwanted sexual acts with her supervisor by threats of discharge if she failed to comply with his demands, has alleged a tangible employment action under Title VII which, if proved, would entitle her to relief against her employer"].)

■ These cases indicate that "customs, practices, and physical settings," weigh heavily against finding a "broadly based and widely accepted community norm[]" that supervisors have a privacy right to engage in intimate relationships with their subordinates. (*Hill, supra,* 7 Cal.4th at pp. 36–37.) In addition, HAFC had an express policy requiring that any supervisor who wanted to maintain an intimate relationship with a subordinate bring the matter to the attention of management to allow management the opportunity to take appropriate action to avoid the potential conflict of interest. Further, Vella expressly told Barbee that "intercompany dating was a bad idea." Thus, Barbee had "advance notice" that HAFC believed his conducting an intimate relationship with a subordinate would present a potential conflict of interest. (*Hill, supra,* 7 Cal.4th at p. 36.) This notice further diminished any expectation of privacy Barbee otherwise may have had in pursuing an intimate relationship with Tomita.

■ We conclude that Barbee did not have a reasonable expectation of privacy in pursuing an intimate relationship with Tomita and therefore cannot establish a necessary element of his invasion of privacy claim. Summary judgment of this claim was proper.

### C. *HAFC's Termination of Barbee Did Not Violate the Public Policy Embodied in Labor Code Section 96, Subdivision (k)*

In order to establish a claim of wrongful termination in violation of public policy, Barbee must prove that he was terminated in violation of a policy that is "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 894 [66 Cal.Rptr.2d 888, 941 P.2d 1157].)

Barbee claims that HAFC's termination of his employment violated the public policy embodied in Labor Code section 96, subdivision (k). Specifically, Barbee maintains that section 96, subdivision (k) prohibits employers from taking adverse action against an employee for any "lawful conduct occurring during nonworking hours away from the employer's premises" (Lab. Code, § 96, subd. (k)), and that his consensual relationship with Tomita was lawful and conducted during nonworking hours away from the workplace. ■ We conclude that Labor Code section 96, subdivision (k) does not set forth an independent public policy that provides employees with any substantive rights, but rather, merely establishes a procedure by which the Labor Commissioner may assert, on behalf of employees, recognized constitutional rights. Therefore, in order to prevail on his wrongful termination claim, Barbee must establish that his employment was terminated because he

asserted civil rights guaranteed by article I of the California Constitution. We conclude that Barbee cannot make this showing and therefore he cannot establish the first necessary element of his wrongful termination claim.[2] Summary judgment of this claim was proper.

Labor Code section 96 provides in relevant part:

"The Labor Commissioner and his or her deputies and representatives authorized by him or her in writing shall, upon the filing of a claim therefor by an employee, or an employee representative authorized in writing by an employee, with the Labor Commissioner, take assignments of:

"[¶] . . . [¶]

"(k) Claims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises."

Subdivision (k) was added to Section 96 by Statutes 1999, chapter 692, section 2. As Barbee himself acknowledges in his brief, the "Legislature's purpose in enacting [s]ubdivision (k) is clearly stated in [s]ection 1 of the statute as chaptered." That uncodified portion of the statute sets forth an express statement of the public policy embodied in subdivision (k):

"The Legislature finds and declares that, absent the protections afforded to employees by the Labor Commissioner, an individual employee is ill-equipped and unduly disadvantaged in any effort to assert the civil rights otherwise guaranteed by Article I of the California Constitution. The Legislature further finds and declares that allowing any employer to deprive an employee of any constitutionally guaranteed civil liberties, regardless of the rationale offered, is not in the public interest. The Legislature further declares that this act is necessary to further the state interest in protecting the civil rights of individual employees who would not otherwise be able to protect themselves." (Stats. 1999, ch. 692, § 1.)

■ An uncodified portion of a statute is fully part of the statutory law of this state. (*Los Angeles County v. Payne* (1937) 8 Cal.2d 563, 574 [66 P.2d 658].) " 'Statutory language should not be interpreted in isolation, but must be construed in the context of the entire statute of which it is a part, in order to achieve harmony among the parts.' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 903 [135 Cal.Rptr.2d 30, 69 P.3d 951], quoting *People v. Morris* (1988) 46 Cal.3d 1, 16 [249 Cal.Rptr. 119, 756 P.2d 843].)

---

[2] Accordingly, we need not consider any of the other elements.

■ By its plain language, Labor Code section 96 *itself* does not describe any public policies. Rather, it simply outlines the types of claims over which the Labor Commissioner shall exercise jurisdiction. (See *Resnik v. Anderson & Miles* (1980) 109 Cal.App.3d 569, 572 [167 Cal.Rptr. 340] ["Labor Code sections 96 and 98, subdivision (a), expressly allow the Labor Commissioner to take assignment of employee claims with the authority to resolve all matters within its jurisdiction"]; accord *California Chamber of Commerce v. Simpson* (C.D.Cal. 1985) 601 F.Supp. 104, 109 ["Section 96[, subdivision] (h) at least authorizes and may require the Labor Commissioner to accept assignments of severance benefit claims, for the purpose of prosecuting such claims on behalf of the assignor-employee"].) "Throughout its history, section 96 has not served as an original source of employee rights against employers, but has instead provided a supplemental procedure for asserting employee claims for which the legal basis already existed elsewhere in the law." (83 Ops.Cal.Atty.Gen. 226 (2000).) In particular, subdivision (k) does not, on its face, preclude an employer from taking any action. Rather, the language of the statute refers to preexisting "claims," and provides that the Labor Commissioner shall take assignment of such claims.[3]

Reading the statute "as a whole" (*Robert L. v. Superior Court, supra,* 30 Cal.4th at p. 903 [135 Cal.Rptr.2d 30, 69 P.3d 951]) we agree with Barbee that the uncodified statement of legislative intent provides "a clear[] statement of public policy." However, that statement is simply that "allowing any employer to deprive an employee of any constitutionally guaranteed civil liberties, regardless of the rationale offered, is not in the public interest." (Lab. Code, § 96, subd. (k).) ■ While "individual employee[s]" (Labor Code, § 96, subd. (k)) could already pursue a claim for wrongful discharge based upon an employer's violation of such liberties (see, e.g., *Rojo v. Kliger* (1990) 52 Cal.3d 65, 90–91 [276 Cal.Rptr. 130, 801 P.2d 373]), Lab. Code section 96, subdivision (k) allows the Labor Commissioner to act on their behalf. Thus, Lab. Code section 96, subdivision (k) does not create any new public policies. Rather, it authorizes the Labor Commissioner to vindicate existing public policies in favor of individual employees.

This interpretation "is consistent with the primary function of section 96 to supply an additional means of enforcement of rights already established elsewhere. . . ." (83 Ops.Cal.Atty.Gen. 226 (2000).)

---

[3] We note that Labor Code section 98.6 was amended in 2001 (Stats. 2001, ch. 820, § 2), and provides in relevant part: "(a) No person shall discharge an employee or in any manner discriminate against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96. . . ." Neither party has relied upon this provision and we do not consider it in this appeal.

The Attorney General has reached the same conclusion in determining that the 1999 amendment to Lab. Code section 96 did not change prior law that permitted law enforcement agencies to discipline peace officers for lawful off-duty conduct in conflict with their duties as peace officers. The Attorney General concluded "that subdivision (k) was added to section 96 so that the Commissioner could 'assert the civil rights otherwise guaranteed by Article I of the California Constitution' for employees 'ill-equipped and unduly disadvantaged' to assert such rights." (83 Ops.Cal.Atty.Gen. 226 (2000) [quoting Stats. 1999, ch. 92, § 1].) We agree with the Attorney General that "the 1999 amendment of section 96 did not create new substantive rights for employees. Rather, it established a procedural mechanism that allows the Commissioner to assert, on behalf of employees, their independently recognized constitutional rights." (83 Ops.Cal.Atty.Gen. 226 (2000).) Therefore, we conclude that in order to prevail on a public policy claim pursuant to Labor Code section 96, subdivision (k), Barbee must establish that he was terminated for asserting civil rights guaranteed by article I of the California Constitution.[4]

The sole basis for Barbee's claim that he was terminated for asserting civil rights guaranteed by article I of the California Constitution was that HAFC violated his state constitutional right to privacy by terminating his employment because of his relationship with Tomita. Since we conclude in part III.B of this opinion that HAFC's termination of Barbee's employment did not invade his right to privacy under article I, section 1 of the California Constitution, Barbee's wrongful termination claim fails as a matter of law.

## IV.

## CONCLUSION

HAFC's termination of Barbee, based on his relationship with a subordinate, did not violate Barbee's constitutional right to privacy, and did not violate any public policy embodied in Labor Code section 96, subdivision (k).

---

[4] The legislative history pertaining to Labor Code section 96, subdivision (k) supports the conclusion that this statute was enacted to provide an alternative procedural mechanism to recover wages, rather than to grant employees new substantive rights. The final committee report notes that "Proponents argue this bill would assure an alternative administrative remedy as a viable alternative for employees seeking to recover wages. This administrative remedy would obviate the need for potential court action. They argue that although there are only a handful of these cases each year, this bill would be yet one more avenue to reduce court congestion." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1689 (1999–2000 Reg. Sess.) as amended Aug. 30, 1999.)

## V.

## DISPOSITION

The judgment is affirmed. HAFC is entitled to costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.