[No. D045751. Fourth Dist., Div. One. Mar. 20, 2006.]

LAWRENCE C. KUPERMAN, Plaintiff and Appellant, v.
SAN DIEGO COUNTY ASSESSMENT APPEALS BOARD NO. 1,
Defendant and Respondent;
GREGORY J. SMITH, as County Assessor, etc., Real Party in Interest and
Respondent.

922

## COUNSEL

Lawrence C. Kuperman, in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

John J. Sansone, County Counsel, and Walter J. De Lorrell III, Deputy County Counsel, for Real Party in Interest and Respondent.

## OPINION

**McCONNELL, P. J.**—Lawrence C. Kuperman appeals the denial of his petition for a writ of administrative mandamus to set aside a decision of the Assessment Appeals Board (the Board) finding the San Diego County Tax Assessor (the Assessor) lacked jurisdiction to consider Kuperman's application for a reduction in the base year value of property because the application was not timely filed. We affirm the judgment.

### FACTS

In 1996, Kuperman paid $185,000 to purchase a 50-acre parcel located in the De Luz area of Fallbrook. Angie Fedele, a real estate appraiser in the Assessor's office, valued the property. In 1993, Fedele had valued the property at $300,000 when it changed ownership. By 1996, the enrolled value of the property was $313,076. Fedele initially believed Kuperman's $185,000 purchase price "look[ed] low." However, after considering declines in the real estate market from 1993 to 1996, information about the property contained in the multiple listing service, comparable sales, and evidence showing the parcel possibly had unexploded military ordnance from Camp Pendleton, she determined the purchase price was within the range of market value for the property.

In September 2002, Kuperman filed an application with the Assessor for a reduction in the base year value of his property on the assessment rolls because he had discovered in August 2001 that San Diego Gas & Electric Company (SDG&E) had an easement over his land. This easement had been recorded in 1972 but had not been disclosed on the exceptions to the title insurance policy issued when Kuperman purchased the property in 1996. At the time he made his application to the Assessor, the enrolled value of the real property on the Assessor's roll was $198,447. Kuperman believed the real property should be valued at $38,242.

The Assessor denied Kuperman's application. Kuperman appealed to the Board. The Board, after holding hearings, denied his appeal on the basis his application to challenge the Assessor's base year value, which had been based on the Assessor's exercise of judgment as to value, was untimely filed because it was filed more than four years after the base year value was determined and the Board lacked jurisdiction to change the base year value.

Kuperman filed a petition for a writ of mandamus in superior court to set aside the Board's decision. The court found Kuperman's application for a reduction in the base year value was untimely and denied the petition.

## DISCUSSION

### I

### *Timeliness of Application*

Kuperman contends the trial court erred in finding the Assessor lacked jurisdiction to revise the base year value. He contends Revenue and Taxation Code[1] section 51.5 authorized the Assessor to correct the base year value in the assessment year after the easement was discovered, not just during the first four years after the base year value was first determined.

■ Under the California Constitution, article XIII A, section 1, subdivision (a), a county assessor must determine a base year value for property when it changes ownership, that is, the "full cash value" or "fair market value" of the property. (§ 110.1, subd. (b).) "For purposes of determining the 'full cash value' or 'fair market value' of real property . . . 'full cash value' or 'fair market value' is the purchase price paid in the transaction unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction. The purchase price shall, however, be rebuttably presumed to be the 'full cash value' or 'fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other . . . ." (§ 110, subd. (b).) "[A]fter a property's base year value is determined, subsequent entries onto the assessment rolls [generally] are done

---

[1] All statutory references are to the Revenue and Taxation Code unless otherwise specified.

pro forma without the need to exercise one's judgment as to value, simply by applying an inflation factor to the previous year's entry." (*Montgomery Ward & Co. v. County of Santa Clara* (1996) 47 Cal.App.4th 1122, 1137 [55 Cal. Rptr. 2d 261] (*Montgomery Ward*); see § 51.[2])

Section 51.5 allows a taxpayer to request the assessor to correct the base year. In relevant part, section 51.5, states:

"(a) Notwithstanding any other provision of the law, any error or omission in the determination of a base year value . . . , including the failure to establish that base year value, which does not involve the exercise of an assessor's judgment as to value, shall be corrected in any assessment year in which the error or omission is discovered.

"(b) An error or an omission described in subdivision (a) which involves the exercise of an assessor's judgment as to value may be corrected only if it is placed on the current roll or roll being prepared, or is otherwise corrected, within four years after July 1 of the assessment year for which the base year value was first established."

In enacting section 51.5, the Legislature added a preamble to section 51.5, stating:

"(a) The Legislature finds and declares that fairness and equity require that *county assessors have express authority to make corrections to property tax base-year values whenever it is discovered that a base-year value does not reflect applicable constitutional or statutory valuation standards* or the base-year value was omitted. Any limitations imposed upon the assessor's authority to correct these errors would result in a system of taxation which, on the one hand, denies the benefits of Article XIII A of the California Constitution to some taxpayers where the barred error or correction would reduce the base-year value and, on the other hand, encourages even the most honest person to engage in deception and concealment in order to delay discovery of changes in ownership or new construction beyond the point where a correction of the base-year value can be made. Further, the failure to place any value on the assessment roll for property which completely escapes taxation because of limitations on the authority to correct errors would violate the constitutional requirement that all property in the state shall be subject to taxation. Nothing in this act violates either the spirit or the letter of Article XIII A of the California Constitution since all corrections permitted by

---

[2] Section 51 also allows for a reassessment of property in subsequent years, including a reassessment that would be lower than the initial base year value plus the inflation factor.

it must be consistent with applicable constitutional and statutory valuation standards.

"(b) The Legislature further finds and declares that the provisions of law relating to escape assessments are in no way inconsistent with Article XIII A of the California Constitution. An escape assessment merely reflects the amount by which the property has been underassessed and is a mechanism which permits the correction of the effects of that underassessment. The amount of the underassessment must be determined, however, in accordance with the applicable statutory valuation standards. Thus, an escape assessment is merely a mechanism for implementing existing property tax law and cannot be in conflict with it. Accordingly, the amendments to Sections 531.2 and 532 of the Revenue and Taxation Code made by this act are necessary to make clear that an escape assessment resulting from the correction of an error in a base-year value may be made within four, six, or eight years, as applicable, after the first day of July of the assessment year, as defined in Section 118 of the Revenue and Taxation Code, in which the property either wholly escaped taxation or was underassessed, as determined by applying the applicable Article XIII A valuation standards." (Stats. 1987, ch. 537, § 1(a), (b), p. 1834; reprinted at Historical and Statutory Notes, 59 West's Ann. Rev. & Tax. Code (1998 ed.) foll. § 51.5 p. 24, italics added.)

Section 51.5 was enacted in response to *Dreyer's Grand Ice Cream, Inc. v. County of Alameda* (1986) 178 Cal.App.3d 1174 [224 Cal.Rptr. 285] (*Dreyer's*). (*Sea World, Inc. v. County of San Diego* (1994) 27 Cal.App.4th 1390, 1399, fn. 13 [33 Cal.Rptr.2d 194] (*Sea World*).) *Dreyer's* involved "escape assessments"[3] and "whether the four-year statutory bar prescribed for escape assessments begins to run from the time when the base year value of the property was originally determined under Proposition 13 (Cal. Const., art. XIII A, § 2) and its implementing legislation (§ 110.1), or whether it commences to run from the assessment year in which the property, in whole or in part, escaped taxation." (*Dreyer's, supra,* at p. 1178.) The *Dreyer's* court concluded there were conflicts between a pre-proposition statute, section 532, and Proposition 13. "To harmonize the two, the court held that (1) the 'lien date' (i.e., March 1) should be substituted for the 'July 1' date referred to [in] section 532, and (2) 'the year when the base value of the property was determined pursuant to' Proposition 13 should be substituted for the term 'the

---

[3] Escape assessments are deficiency assessments that are assessed retroactively to remedy omissions or errors in the original assessment of taxable property. (*Helene Curtis, Inc. v. Assessment Appeals Bd.* (1999) 76 Cal.App.4th 124, 128, fn. 1 [90 Cal.Rptr.2d 31].)

assessment year' in section 532." (*Montgomery Ward, supra,* 47 Cal.App.4th at pp. 1134–1135; see *Dreyer's,* at p. 1180.)

Following the *Dreyer's* decision, the Legislature enacted section 51.5 " 'to adopt clear guidelines for the correction of post-1975 base year values and to restore the statutory meaning of the terms used in the escape assessment provisions.' " (*Sea World, supra,* 27 Cal.App.4th 1390, 1399, fn. 13, quoting State Bd. of Equalization, Analysis of Sen. Bill No. 587 (1987–1988 Reg. Sess.), Aug. 31, 1987.) Notably, the Legislature in section 51.5, subdivision (b), left intact the four-year limit on corrections of errors involving an assessor's value judgment, a provision consistent with the *Dreyer's* decision. (*Sea World, supra,* at p. 1399, fn. 13.)

■ The courts have found challenges to fall within the scope of section 51.5, subdivision (a) if they do not involve challenging the assessor's determination of the fair market valuation of the property. Thus, courts have found section 51.5, subdivision (a) encompasses an assessor's erroneous determination that a change of ownership occurred (see *Sunrise Retirement Villa v. Dear* (1997) 58 Cal.App.4th 948, 957 [68 Cal.Rptr.2d 416] (*Sunrise Retirement*))[4] and the assessor's failure to set a new base year value upon a change of ownership (see *Montgomery Ward, supra,* 47 Cal.App.4th 1122, 1138). Clerical errors, that is, "defects of a mechanical, mathematical, or clerical nature, not involving judgment as to value" also fall within the limitations period of section 51.5, subdivision (a). (See § 51.5, subds. (c), (f)(2).) Finally, errors or omissions that result from the taxpayer's fraud, concealment, misrepresentation or failure to comply with legal requirements for furnishing information fall within the longer limitations period of section 51.5, subdivision (c).[5]

The courts have found challenges to fall within the scope of section 51.5, subdivision (b) when they involve a claim the assessor's determination of the base year value failed to reflect the fair market value of the property. (See

---

[4] Kuperman argues *Sunrise Retirement* supports a conclusion the Assessor had the authority to correct the error in his base year value at any time after discovery. Kuperman's reliance is misplaced since *Sunrise Retirement* involved an error that was encompassed within section 51.5, subdivision (a) (erroneous determination of change of ownership), an error that is correctable at any time after discovery rather than, as is the case here, an error encompassed by section 51.5, subdivision (b) that is subject to the four-year limitations period.

[5] Section 51.5, subdivision (c) states: "An error or an omission involving the exercise of an assessor's judgment as to value *shall not include* errors or omissions resulting from the taxpayer's fraud, concealment, misrepresentation, or failure to comply with any provision of law for furnishing information required by Sections 441, 470, 480, 480.1, and 480.2, or from clerical errors." (Italics added.)

*Metropolitan Culinary Services, Inc. v. County of Los Angeles* (1998) 61 Cal.App.4th 935, 941 [71 Cal.Rptr.2d 859] [claimed incorrect method of calculation used in computing base year value for a possessory lease interest found to be "a situation under section 51.5, subdivision (b), in that an assessor exercised discretion in initially setting the base year value . . . ."]; see also *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 33 [84 Cal.Rptr.2d 715] [challenge claiming overassessment of property and erroneous base year value is a matter involving the exercise of judgment as to value];[6] *Blackwell Homes v. County of Santa Clara* (1991) 226 Cal.App.3d 1009, 1017 [277 Cal.Rptr. 251] ["where the assessor has already had one 'bite [at] the apple,' i.e., where he has once exercised his judgment as to value of the property and now wants to change his mind," under the statutory scheme, including section 51.5, the assessor "should do it within four years or not at all"].)

Kuperman contends his situation falls within the scope of section 51.5, subdivision (a), which allows correction of the base year value in any assessment year in which an error or omission was discovered. He argues language in the preamble to section 51.5 supports "an unconditional expansion of authority to correct *any* error in the determination of base year values whenever discovered." Kuperman also relies on quotations and characterizations of the legislative history of section 51.5 contained in *Sunrise Retirement, supra,* 58 Cal.App.4th 948, 959. The *Sunrise Retirement* court stated:

"[T]he legislative history of the law strongly supports the view that lifting time restrictions on correcting nonjudgmental mistakes was meant to be a two-way street, benefiting taxpayers and assessors equally.

"The Senate Revenue and Taxation Committee report on Senate Bill No. 587 (1987–1988 Reg. Sess.) states, 'Since it is possible for assessment errors to go either way, both in favor of and against the taxpayer, the [*Dreyer's*] case can result in higher taxes on a property due to a now-uncorrectable assessment error. *If, for example, a property is appraised too high based on incorrect information,* and neither the taxpayer nor the assessor

---

[6] In *Plaza Hollister Ltd. Partnership v. County of San Benito, supra,* 72 Cal.App.4th 1, a property owner challenged the base year value, contending the amount should have been reduced by cash equivalent adjustments. The assessor rejected the argument and the county board of supervisors upheld the assessor's valuation. The corporation filed a tax refund action. The trial court entered a stipulated judgment, which reduced the base year value of the property. The assessor appealed. The appellate court held the judgment was void, noting the trial court lacked jurisdiction "to exercise judgment as to value and equalize an individual assessment." (*Id.* at p. 33.)

realize the error for more than four years, existing law . . . would prevent the tax from being reduced now or in any future year until the property changes ownership.' (Comments, Sen. Rev. & Tax. Com. Dig. (Apr. 22, 1987) Sen. Bill No. 587, p. 2, italics added.) The Assembly report emphasizes that the correction 'must be made in the year the error or omission was discovered, *regardless of when the valuation was originally made*.' (Bill Rep. on Sen. Bill No. 587, Assem. Com. on Rev. & Tax. (June 22, 1987) italics added.) The report also boasts of the new law's ameliorative effect on property owners: 'Bill Protects Taxpayers From Overassessments. [¶] It is possible for assessment errors to occur which either underassess or overassess properties. If a property is inadvertently valued too high, and the overvaluation is not discovered within four years, under current law the tax could not be reduced until the property changes ownership. *This bill is intended to protect taxpayers from this kind of inflexibility*, . . . .' (*Id.* at p. 3, italics added.)" (*Sunset Retirement, supra*, 58 Cal.App.4th at p. 959.)

While the preamble and the quoted legislative history contain some sweeping language that apparently support Kuperman's argument, we must focus on the actual legislation enacted and apply the rules of statutory construction.

In interpreting a statute, we must look first to the words of the statute, giving to the language its usual, ordinary import and giving significance to every word, phrase and sentence if possible. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 906 P.2d 1057].) " 'When used in a statute[, words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citation.] 'Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' " (*Pueblos Del Rio South v. City of San Diego* (1989) 209 Cal.App.3d 893, 905 [257 Cal.Rptr. 578].) "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].) "When the statutory language is unambiguous, ' "we presume the Legislature meant what it said and the plain meaning of the statute governs." ' " (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1261 [8 Cal.Rptr.3d 532, 82 P.3d 740], quoting *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)

Here, the words of section 51.5 unambiguously state that only some errors in the base year value are subject to correction at any time. Under subdivision (a) of section 51.5, errors or omissions in the base year value not involving the exercise of an assessor's judgment as to value are correctible "in any assessment year in which the error or omission is discovered." In contrast, under subdivision (b) of section 51.5 errors or omissions in the base year value "involv[ing] the exercise of an assessor's judgment as to value may be corrected only if it is placed on the current roll or roll being prepared, or is otherwise corrected, within four years after July 1 of the assessment year for which the base year value was first established." Simply put, while the legislative history and preamble cited by Kuperman refer to correction of errors whenever discovered, the language of section 51.5, subdivision (b) unambiguously provides that errors involving the assessor's exercise of judgment as to value are subject to a four-year limitations period. Since the words of the statute are clear in this regard, we must rely on the language actually used and not the legislative history.

Kuperman contends the language of section 51.5 supports a conclusion that an assessor's exercise of judgment as to value occurs only when the assessor enrolls the property at some value other than the purchase price and since the Assessor enrolled his property at the purchase price, the Assessor exercised no judgment as to the value of the property. The record, however, shows the Assessor's office did not simply enroll the property at the purchase price. Instead, the Assessor, believing the $185,000 purchase price was below the fair market value of the property since the property had sold for $300,000 in 1993, conducted an investigation. Only after considering declines in the real estate market from 1993 to 1996, information about the property contained in the multiple listing service, comparable sales, and evidence showing the parcel possibly had unexploded military ordnance from Camp Pendleton, did the Assessor conclude the purchase price was within the range of market value for the property. The assessor in this case clearly made a judgment call that the purchase price adequately reflected the fair market value of the property.

Kuperman contends the Assessor failed to take into account the SDG&E easement when the property was valued in 1996 and therefore the Assessor did not exercise judgment as to the value of the easement. The easement here, however, was recorded and, thus, we must presume the Assessor took into account the easement at the time the base year value was determined. Kuperman has not provided any information supporting a contrary conclusion. Moreover, at a minimum, both the Assessor and Kuperman must be

charged with constructive notice of the easement. Recording an easement gives notice to prospective purchasers and to the assessor's office that the land is encumbered with an easement. (Civ. Code, § 1213.)

■ Whatever is the ultimate scope of section 51.5, subdivision (a), it clearly was not intended to encompass recorded easements. Recorded easements necessarily are encompassed within an assessor's exercise of judgment as to value since recorded easements directly affect the fair market value of property and thus the assessor's judgment as to that property's value. To hold a taxpayer's late discovery of a recorded easement falls within subdivision (a) of section 51.5 would create the anomalous situation that, on the one hand, the taxpayer is charged with notice of the easement at the time of the purchase because it is recorded and, on the other hand, the taxpayer is given an unlimited period in which to "discover" the easement. We do not believe the Legislature intended this result.

■ We conclude Kuperman's claim fell within the scope of section 51.5, subdivision (b) and was not timely brought within the four-year limitations period.

II

*Due Process and Equal Protection*

Kuperman asserts the constitutional guarantees of due process and equal protection require that he be permitted an opportunity to have the base year value corrected. He asserts it is fundamentally unfair to deny "a property owner the opportunity to have corrected an error in the determination of his base year value whenever an error is discovered." He asks, "Why should a taxpayer get stuck with an inflated base year value simply because an error in the purchase price enrolled by the Assessor in lieu of appraising the property was not discovered within four years of the enrollment of the base year value?" According to Kuperman, "The Legislature clearly recognized the problem," and "[i]n light of the obvious harm and the absence of any legitimate countervailing interest any limitation on the assessor's authority to correct such an error would violate substantive due process and equal protection." He urges us to "interpret 51.5[, subdivision ](a) to apply to [his] application." We find these arguments unpersuasive.

First, as the Assessor points out, Kuperman did not raise these issues below and therefore did not preserve them for appeal. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].)

Second, as appellant, Kuperman is obligated to support his assertion of error with relevant legal authority and analysis; he has the burden of showing error occurred. (See *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72] ["Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court"]; *Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 [41 Cal.Rptr.2d 362, 895 P.2d 469] [burden of showing error occurred]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1226 [126 Cal.Rptr.2d 178] [rejecting due process argument when appellants failed to develop any argument or cite relevant authority to support their argument].) In his one-page argument, he cites only two cases: (1) *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153], in support of his due process argument; and (2) *Nordlinger v. Hahn* (1992) 505 U.S. 1 [120 L.Ed.2d 1, 112 S.Ct. 2326], in support of his equal protection argument. *Lassiter* involves a claimed violation of procedural, rather than substantive, due process and whether an indigent parent was entitled to have appointed counsel during a parental termination hearing. *Nordlinger* involves an equal protection challenge to California's property tax scheme on the basis that persons owning similar property were paying different amounts of taxes depending on when the property changed ownership. *Nordlinger* did not address a challenge to a limitations period and upheld the statutory scheme. Kuperman does not explain how either case is relevant to or supports his argument. We fail to see the significance. Nor does he engage in any meaningful argument or analysis as to his due process or equal protection claims other than to assert imposition of a statute of limitations is unfair.

■ Third, Kuperman's argument—asking us to find unconstitutional a limitations period created by the Legislature—ignores long-established law recognizing that "[s]tatutes of limitation are 'within the jurisdictional power of the legislature of a state' . . . ." (*Scheas v. Robertson* (1951) 38 Cal.2d 119, 125 [238 P.2d 982].) " 'A constitutional right is always subject to reasonable statutory limitations as to the time within which to enforce it, if the constitution itself does not provide otherwise. The power of the legislature to provide reasonable periods of limitation, therefore, is unquestioned, and the fixing of time limits within which particular rights must be asserted is a matter of legislative policy the nullification of which is not a judicial prerogative.' " (*Muller v. Muller* (1960) 179 Cal.App.2d 815, 819 [4 Cal.Rptr. 419]; see *Adams v. Roses* (1986) 183 Cal.App.3d 498, 507 [228 Cal.Rptr. 339]; *Fontana Land Co. v. Laughlin* (1926) 199 Cal. 625, 636 [250 P. 669]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79];

*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 534 [85 Cal.Rptr.2d 257, 976 P.2d 808].) Statutes of limitations further a public policy of "promot[ing] repose by giving security and stability to human affairs." (*Wood v. Carpenter* (1879) 101 U.S. 135, 139 [25 L.Ed. 807]; *Shain v. Sresovich* (1894) 104 Cal. 402, 406 [38 P. 51]; see *Norgart v. Upjohn Co., supra,* at p. 396.)[7]

There is nothing inherently unreasonable in the Legislature's determination to limit an assessor's authority to exercise its judgment to change the base year value to a four-year period. Such a limitations period gives property owners a reasonable time to discover latent problems or encumbrances on the property or to challenge the method the assessor used to calculate the base year value. (Cf. *Montgomery Ward, supra,* 47 Cal.App.4th 1122, 1140, where the court rejected an argument that allowing an assessor to correct an error at any time—in that case a failure to set a new base year value upon a change of ownership—was "inherently unfair.")

Finally, we note that a property owner is not left without other remedies. For example, here, Kuperman sought recourse against his title insurance company for failing to disclose the encumbrance that reduced the property's value.[8] Additionally, if an undisclosed encumbrance or circumstance subsequently reduces the value of the property below the base year value, the property owner may seek a reassessment of the property. (§ 51, subd. (a)(2).)

■ The four-year limitations period of section 51.5, subdivision (b) for errors in the base year value involving the assessor's exercise of judgment in determining value does not violate the constitutional guarantee of due process or equal protection.

## DISPOSITION

The judgment is affirmed. Respondent is awarded costs on appeal.

Huffman, J., concurred.

---

[7] The court in *Norgart v. Upjohn Co., supra,* 21 Cal.4th 383, 396, also acknowledged a competing public policy, that is, deciding cases on their merits, and observed, "The two public policies . . .—the one for repose and the other for disposition on the merits—are equally strong, the one being no less important or substantial than the other."

[8] Kuperman's title insurance company paid him $185,000, initially paying him $140,000 based on their appraiser's opinion the easement had reduced the property's value by 20 percent, and later paying him an additional $45,000 after Kuperman's appraiser opined the easement had reduced the property's value by 30 percent.

**AARON, J., Concurring.—**

## I

## INTRODUCTION

While acknowledging that both the legislative history and the preamble to Revenue and Taxation Code[1] section 51.5 refer to correction of errors *whenever* discovered, the majority asserts that "the language of section 51.5, subdivision (b) *unambiguously* provides that errors involving the assessor's exercise of judgment as to value are subject to a four-year limitations period," and concludes that, "[s]ince the words of the statute are clear in this regard, we must rely on the language actually used and not the legislative history." (Maj. opn., *ante*, at p. 929, italics added.)

I do not agree that the language of 51.5 is unambiguous, since it is not at all clear what the phrases "does not involve the exercise of an assessor's judgment as to value" (§ 51.5, subd. (a)) and "involves the exercise of an assessor's judgment as to value" (§ 51.5, subd. (b)) connote. Under the majority's view, this language apparently means that if the assessor exercised judgment in determining the base year value of a property, a four-year limitations period would apply to any attempt to correct any error in that valuation. In my view, an equally or more plausible interpretation of this statutory language would be that if the *alleged error or omission* involves the exercise of the assessor's judgment as to value, e.g., the assessor knew about an easement but *chose* not to reduce the assessed value of the property based on the existence of the easement, a four-year limitations period would apply to any challenge to the assessed value based on the impact of the easement. But if the allegation were that the assessor's valuation was incorrect because the assessor *unknowingly* failed to consider material information affecting the value of the property, e.g., an unrecorded easement, even where the assessor otherwise exercised judgment in determining the base year value, that error may be corrected in any year in which the error or omission is discovered.

To the extent the majority opinion can be read to suggest that the statute unambiguously provides that a four-year statute of limitations would apply in *any* case in which the assessor exercised judgment in arriving at the base-year value, I disagree. However, I concur in the result the majority reaches because I agree that in the particular circumstances of this case, both the assessor and Kuperman must be charged with constructive notice of the

[1] Unless otherwise specified, all subsequent statutory references are to the Revenue and Taxation Code.

San Diego Gas & Electric Company (SDG&E) easement, since "[w]hatever is the ultimate scope of section 51.5, subdivision (a), it clearly was not intended to encompass recorded easements." (Maj. opn., *ante*, at p. 930.) While we need not determine the precise meaning of section 51.5 in order to resolve this case, I write separately to note the ambiguity in the statute.

II

THE ENACTMENT OF SECTION 51.5

A. *The decision in* Dreyer's Grand Ice Cream, Inc. v. County of Alameda *and the impact of Proposition 13*

According to the legislative history of section 51.5, the statute was enacted in response to *Dreyer's Grand Ice Cream, Inc. v. County of Alameda* (1986) 178 Cal.App.3d 1174 [224 Cal.Rptr. 285] (*Dreyer's*). (See 3d reading analysis of Sen. Bill No. 587 (1987–1988 Reg. Sess.) as amended Aug. 20, 1987, p. 1 (hereafter third reading analysis); Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 587 (1987–1988 Reg. Sess.) prepared for Governor Deukmejian (Sept. 4, 1987) p. 1 (hereafter Enrolled Bill Report); State Bd. of Equalization, Legislative Bill Analysis of Sen. Bill No. 587 (1987–1988 Reg. Sess.) as introduced Feb. 25, 1987, p. 1 (hereafter State Board of Equalization analysis); Sen. Com. on Rev. & Tax., analysis of Sen. Bill No. 587 (1987–1988 Reg. Sess.) as introduced Feb. 25, 1987, p. 1 (hereafter Senate Committee analysis).)

In *Dreyer's*, the county assessor physically inspected and appraised a cold storage warehouse that had recently been built on a property owned by Dreyer's predecessor, Associated Food Stores, Inc. (Associated). The appraisal was done as of March 1, 1976, the lien date for the 1976–1977 assessment year. (*Dreyer's, supra*, 178 Cal.App.3d at p. 1177.) In June 1978, Proposition 13, which redefined the base year values of both pre-1975 and post-1975 properties, was adopted. (*Dreyer's, supra*, 178 Cal.App.3d at p. 1177.) As a result of the enactment of Proposition 13 in 1978, property taxes in California were reassessed at the lower of the fair market value or the "base year value," which was defined as the county assessor's valuation as of the 1975–1976 tax year. After the enactment of Proposition 13, increases in value were limited to a maximum of 2 percent per year. Further, a change in base year value would occur only upon a transfer of ownership. (*Metropolitan Culinary Services, Inc. v. County of Los Angeles* (1998) 61 Cal.App.4th 935, 939 [71 Cal.Rptr.2d 859].) Thus, an inflated or underassessed base year value, if left uncorrected, would result in either overtaxation or undertaxation of the property at issue until such time as the property changes hands.

After the enactment of Proposition 13, the county assessor in *Dreyer's* reassessed the "warehouse improvements" by adopting the value shown on the

1976–1977 assessment roll and adding a 2 percent inflation increase. (*Dreyer's, supra*, 178 Cal.App.3d at p. 1177.) In the fall of 1980, the county assessor conducted an audit of the books and records of Associated and discovered that the warehouse improvements had been substantially underassessed for 1976–1977, and for all subsequent years. (*Ibid.*)[2]

In February of 1981, the assessor revised the base year value of the warehouse and levied escape assessments for the tax years 1977–1978, 1978–1979, 1979–1980 and 1980–1981. (*Dreyer's, supra*, 178 Cal.App.3d at pp. 1177–1178.) Associated paid the increased taxes, under protest, and ultimately filed a lawsuit for a refund of the escape assessments. (*Id.* at p. 1178.) While that case was pending, Dreyer's, which had purchased the warehouse, was substituted as plaintiff. (*Ibid.*)

The issue in *Dreyer's*, as stated by the Court of Appeal, was "whether the four-year statutory bar prescribed for escape assessments begins to run from the time when the base year value of the property was originally determined under Proposition 13 (Cal. Const., art. XIII A, § 2) and its implementing legislation (§ 110.1), or whether it commences to run from the assessment year in which the property, in whole or in part, escaped taxation." (*Dreyer's, supra*, 178 Cal.App.3d at p. 1178.)[3]

*Dreyer's* argued that "Proposition 13 brought about radical changes in our property taxation system which, of necessity, impacted the whole statutory scheme relating to property taxes . . . Proposition 13 made the base year value of the property the cornerstone of taxation which cannot be revised or altered under the guise of escape assessments. While escape assessments are still available to the taxing authority in case the property was underassessed or escaped taxation altogether, this power of the assessor must be exercised in harmony with Proposition 13. It follows that the four-year limit prescribed by the statute must commence from the base year and may not depend on the happenstance when the assessor discovers the error in assessment." (*Dreyer's, supra*, 178 Cal.App.3d at pp. 1178–1179.)

The *Dreyer's* court agreed with this argument and affirmed the judgment, holding that the assessor could not correct a Proposition 13 base year value—and thus, that taxes could not be collected—for an underassessment that was not discovered until more than four years after the base year value was established. In explaining its reasoning, the court observed that in enacting section 80, "the Legislature intended to set a deadline for challenging

---

[2] The *Dreyer's* opinion does not discuss the nature of the improvements that were underassessed, nor does it explain how the underassessment occurred.

[3] Section 80 provided that the taxpayer had four years from the original assessment to challenge an alleged overvaluation of the base value of newly constructed property.

the base year values outlined in section 110.1. Since section 80 allows the taxpayer four years from the time of the original determination of the base year value to file a challenge, elementary fairness requires that the county shall have only the same period of time within which to correct the base year values by way of escape assessments." (*Dreyer's*, *supra*, 178 Cal.App.3d at p. 1181.)

## B.   *Section 51.5*

### 1.   *The language of section 51.5*

The uncodified preamble to section 51.5 provides in part, "The Legislature finds and declares that fairness and equity require that county assessors have express authority to make corrections to property tax base-year values whenever it is discovered that a base-year value does not reflect applicable constitutional or statutory valuation standards or the base-year value was omitted. Any limitations imposed upon the assessor's authority to correct these errors would result in a system of taxation which, on the one hand, denies the benefits of Article XIII A of the California Constitution to some taxpayers where the barred error or correction would reduce the base-year value and, on the other hand, encourages even the most honest person to engage in deception and concealment in order to delay discovery of changes in ownership or new construction beyond the point where a correction of the base-year value can be made . . . ."[4]

The pertinent portions of section 51.5 provide, "(a) Notwithstanding any other provision of the law, any error or omission in the determination of a base year value pursuant to paragraph (2) of subdivision (a) of Section 110.1, including the failure to establish that base year value, which does not involve the exercise of an assessor's judgment as to value, shall be corrected in any assessment year in which the error or omission is discovered.

"(b) An error or omission described in subdivision (a) which involves the exercise of an assessor's judgment as to value may be corrected only if it is placed on the current roll or roll being prepared, or is otherwise corrected within four years after July 1 of the assessment year for which the base year value was first established."

The statutory preamble at the very least *implies* that in enacting section 51.5, the Legislature intended to rectify the unfairness it perceived in limiting the ability of *either* the assessor *or* the property owner to correct under or overassessed base year values that would otherwise, under

---

[4] "An uncodified portion of a statute is fully part of the statutory law of this state." (*Barbee v. Household Automotive Finance Corp.* (2003) 113 Cal.App.4th 525, 534 [6 Cal.Rptr.3d 406].)

Proposition 13, affect the property tax "in perpetuity." (3d reading analysis, *supra*, at p. 2; see discussion of Prop. 13, *ante*, at pp. 934–935.) If that was the intent of the Legislature, then the interpretation of section 51.5 that would make the most sense would be to say that where *the error or omission* did not involve the assessor's judgment as to value, i.e., in determining the base year value, the assessor *unknowingly* failed to take into consideration information bearing on the value of the property, under section 51.5, subdivision (a), such error or omission may be corrected in any year in which it is discovered. But in cases in which the assessor *did* exercise judgment *as to the subject matter of the alleged error or omission*, under subdivision (b), a four-year statute of limitations would apply. However, the statute itself is not clear as to what the Legislature meant by the phrase "an error or omission . . . which involves the exercise of an assessor's judgment as to value." (§ 51.5, subd. (b).)

### 2. *Legislative history of section 51.5*

Where the language of a statute is ambiguous, courts must " 'examine the history and background of the statutory provision in an attempt to ascertain the most reasonable interpretation of the measure.' " (*Delaney v. Baker* (1999) 20 Cal.4th 23, 29–30 [82 Cal.Rptr.2d 610, 971 P.2d 986], quoting *Watts v. Crawford* (1995) 10 Cal.4th 743, 751 [42 Cal.Rptr.2d 81, 896 P.2d 807].) Unfortunately, the legislative history of section 51.5 serves only to highlight the ambiguity of the statutory language. While all interested entities agreed that section 51.5 was intended to respond to the *Dreyer's* decision, the documents comprising the legislative history of the statute reveal that these entities had diametrically opposite interpretations of what occurred in the *Dreyer's* case, and thus, what the effect of section 51.5 would be.

Under the heading, "Specific Findings," the Enrolled Bill Report states: "This bill would clarify current law related to the correction of base-year value. For example, the omission in the court case mentioned above [*Dreyer's*] *was not due to an error in the assessor's judgment. The property in question was omitted unknowingly. Thus, under the provisions of this bill, the assessor would have been able to correct the omission.* [¶] The proposed provisions would specify that if an error in the determination of the base-year value of property occurs that is not related to a judgment made by the assessor, the base-year value can be adjusted in the year the error or omission is discovered." (Enrolled Bill Rep., *supra*, at p. 2, italics added.)

However, the third reading analysis states: "In a 1986 case (*Dreyer's Grand Ice Cream vs. County of Alameda*) relating to escaped value *where the assessor made a valuation judgment error* the court ruled that the assessor may not correct Proposition 13 base-year values more than four years after the

base-year value was established and, therefore, tax may not be collected for any year on that escaped value." (3d reading analysis, *supra*, at p. 1, italics added.)

The report goes on to state: "This bill: 1) Permits the county assessor to correct any base-year valuation error or omission *which does not involve the exercise of the assessor's judgment as to value (for example, a clerical or mathematical error)*. Such correction must be made in the year the error or omission is discovered, regardless of when the valuation was originally made." (3d reading analysis, *supra*, at p. 1, italics added.)

The State Board of Equalization analysis similarly discusses the *Dreyer's* case and then states that the decision "arises in the context of an error in a base-year value *which involved the exercise of the assessor's value judgment . . . .*" (State Bd. of Equalization analysis, *supra*, at p. 3, italics added.) The Senate Committee analysis states, "In the *Dreyer's* case the assessor valued a cold-storage warehouse at $1 million less than its actual 1976 fair market value, because the appraiser unknowingly omitting [*sic*] certain pertinent information from the appraisal." (Sen. Com. analysis, *supra*, at p. 1.) Under the heading, "*Dreyer's* case can cause both higher and lower taxes," the minutes state: "Since it is possible for assessment errors to go either way, both in favor of and against the taxpayer, the *Dreyer's* case can result in higher taxes on a property due to a now-uncorrectable assessment error. *If, for example, a property is appraised too high based on incorrect information, and neither the taxpayer nor the assessor realize the error for more than four years, existing law, as interpreted by the Supreme Court,* [*sic*: Court of Appeal] *would prevent the tax from being reduced now or in any future year until the property changes ownership.*" (Sen. Com. analysis, *supra*, at p. 2.)

Under the heading "Assessor's value judgment is not grounds for value change," the analysis continues: "SB 587 would prohibit any correction of base-year value due to an assessor's error in value judgment. For example, if a taxpayer receives a base-year valuation of $100,000, and a newly elected assessor five years later decides that the value should have been $150,000—that his predecessor had simply misjudged the value, the original valuation would stand under this bill. This provision recognizes that there is always a judgment margin in property valuation, and that the assessor may not revalue base-year assessments in the light of '20-20 hindsight.' " (Sen. Com. analysis, *supra*, at p. 2.)

These excerpts from the legislative history of section 51.5 make it clear that at the time the statute was enacted, there was not agreement among interested entities as to whether the underassessment in the *Dreyer's* case did or did not

involve "the exercise of the assessor's judgment as to value."[5] If there was no agreement as to that basic issue, then there could not have been agreement as to what the impact of section 51.5 would be, because there was no consensus as to whether or not an assessment error such as the one that occurred in *Dreyer's* would or would not be correctable after the enactment of section 51.5. Some legislators clearly believed the statute was intended to allow either the assessor or a taxpayer to seek a correction of a base year value *at any time* where the assessor was *unaware* of material information bearing on the value of the property and thus did not take that information into consideration in determining the base year value, thus "overruling" *Dreyer's*. Others apparently believed that under section 51.5, a four-year statute of limitations would apply to *any* attempt to correct the base year value in *any* case in which the assessor had exercised judgment in determining the base year value, *even where* the assessor unknowingly failed to take into consideration information affecting the value of the property, and thus, that the proposed statute was consistent with the result in *Dreyer's*.[6]

## III

## CONCLUSION

While I do not agree with Kuperman that an assessor's exercise of judgment as to value occurs *only* when the assessor enrolls the property at some value other than the purchase price, I have serious reservations about the view suggested in the majority opinion that if the assessor makes a judgment call as to the value of the property—even where the assessor fails to take into consideration material information bearing on the value of the property because that information is unknown to the assessor—the error or omission can fairly be characterized as one that "involves the exercise of the assessor's judgment as to value" within the meaning of section 51.5. I believe the critical inquiry under section 51.5 is whether the *error or omission* did or did not involve the exercise of the assessor's judgment.

---

[5] As noted above, the *Dreyer's* court did not specify the nature of the underassessment in that case, or how it occurred.

[6] Further confusing the issue, under a section entitled, "Comments," the third reading analysis states, "1) According to the Board of Equalization (BOE), the *Dreyer's* decision left several interpretational questions about the ability of assessors to correct errors in post-1975, base-year property values. *It could possibly be interpreted to prevent in perpetuity the assessment of improvements that have been overlooked, if they were not discovered until more than four years after the initial assessment. This would undermine the fairness of the property tax assessment system and create an incentive to withhold information about property value.* [¶] . . . [¶] 3) According to BOE, *this bill is consistent with the Dreyer's decision* in that it requires errors or omissions relating to the exercise of the assessor's judgment to be corrected only within four years of establishment of the value." (3d reading analysis, *supra*, at p. 2, italics added.)

My concern is that there may be cases in which the assessor's determination of the base year value of a property is predicated on erroneous information, such as the assessor's unknowingly including land that is not actually part of the parcel at issue in determining the base year value of a property or underestimating the size of the parcel, based on an incorrect survey, and the error is not discovered until more than four years after the initial assessment. Portions of the majority opinion would suggest that such an error could not be corrected because the assessor exercised judgment in determining the base year value of the property, even where that exercise of judgment was clearly based on incorrect or incomplete information.

I do not agree with the majority that section 51.5 unambiguously provides that a four-year statute of limitations would apply in *any* case in which the assessor exercised judgment in arriving at the base year value. However, because I agree with the majority's conclusion that section 51.5 was not intended to allow a reassessment of a property where, as here, the error alleged is the failure to consider the impact of a *recorded* SDG&E easement on the value of a property, I concur in the result the majority reaches.

A petition for a rehearing was denied April 13, 2006, and appellant's petition for review by the Supreme Court was denied June 21, 2006, S143053.