[No. B235217. Second Dist., Div. One. Aug. 28, 2012.]

LONE STAR SECURITY & VIDEO, INC., et al., Plaintiffs and Appellants, v.
BUREAU OF SECURITY AND INVESTIGATIVE SERVICES, Defendant and Respondent.

446

## Counsel

Wallace, Brown & Schwartz and George M. Wallace for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Alfredo Terrazas, Attorney General, Marc D. Greenbaum and Shawn Paul Cook, Deputy Attorneys General, for Defendant and Respondent.

OPINION

MALLANO, P. J.—At an administrative hearing, the Department of Consumer Affairs, Bureau of Security and Investigative Services (Bureau), revoked the alarm company license of Lone Star Security & Video, Inc. (Lone Star), and also revoked the probationary qualified manager certificate of Bruce Boyer. Lone Star and Boyer filed a petition for a writ of administrative mandate in the trial court, challenging the Bureau's decision. The trial court denied the petition in relevant part, finding the Bureau's revocation decision was supported by substantial evidence.

On appeal, Lone Star and Boyer (sometimes collectively referred to as plaintiffs) contend the Bureau's decision was not supported by substantial evidence. We conclude otherwise and affirm.

I

BACKGROUND

The Bureau is a state agency that operates under the auspices of the Department of Consumer Affairs. It is charged with administering and enforcing the Alarm Company Act (sometimes Act) (Bus. & Prof. Code, §§ 7590–7599.75; all undesignated section references are to that code). The primary purpose of the Act is to protect the public. (§ 101.6.) Pursuant to the Act, the Bureau issued an alarm company license to Lone Star in 1993 and a qualified manager certificate to Boyer in 1994. (See §§ 7590.2 [alarm company operator], 7590.1, subd. (j) [qualified manager].) The director of the Bureau may revoke an alarm company operator license or a qualified manager certificate. (§ 7599.61.) The Alarm Company Operator Disciplinary Review Committee (Committee), composed of three licensed alarm company operators and two members of the public, is charged with handling disciplinary proceedings under the Act. (§ 7591.17 [establishing Committee].)

A. *Administrative Proceeding Resulting in Boyer's Probation*

In December 2004, the Bureau filed an accusation against Lone Star and Boyer based on Boyer's recent plea of nolo contendere to a misdemeanor charge of disturbing the peace. In May 2005, the Committee conducted an

informal hearing and recommended that Lone Star's license and Boyer's certificate be revoked. Lone Star and Boyer sought review before an administrative law judge (ALJ). (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1251–1253 [98 Cal.Rptr.3d 559] (*Lone Star I*).)

"[T]he ALJ issued a written decision, finding Boyer 'used deadly force to protect a sign from vandalism. This reveals an ignorance of the law necessary for a person who is licensed to protect the property and person of California citizens, and it evinces a serious lack of judgment on [Boyer's] part.' Concluding that this constituted good cause to discipline Boyer, the ALJ nevertheless *stayed the order of revocation and placed Boyer's license on probation for three years.* The ALJ further concluded that cause was not established to discipline Lone Star, the alarm company operator, because the conviction was against Boyer and no theory of derivative liability was pled or argued." (*Lone Star I, supra,* 176 Cal.App.4th at p. 1253, italics added.) The director adopted the ALJ's decision, effective April 23, 2007, and ordered Boyer to pay $2,570 in costs to the Bureau and Lone Star to pay a $100 civil penalty.

"In May 2007, Boyer petitioned the superior court for a writ of [administrative] mandate directing the bureau to set aside the [stayed] revocation of [his certificate]. Following a hearing on May 2, 2008, the trial court denied the petition. Among other things, it found substantial evidence supported the bureau's finding that Boyer's conviction was substantially related to his fitness as an alarm company qualified manager: '[T]he conduct for which Boyer was convicted, and for which he was disciplined administratively, . . . was directly related to his alarm and security business, and no evidence in the administrative record shows or even purports to show otherwise.' " (*Lone Star I, supra,* 176 Cal.App.4th at p. 1254.) The Court of Appeal affirmed, upholding the three-year probation of Boyer's certificate. (*Id.* at p. 1259.) Thereafter, the Bureau commenced the current proceeding to revoke Lone Star's license and Boyer's certificate.

B. *Administrative Proceeding Resulting in Revocation*

On July 13, 2009, the Bureau filed a first amended accusation and a petition to revoke Boyer's probation, thereby lifting the stay on the revocation of his certificate. The amended accusation listed six charges warranting discipline against Boyer, five of which were also brought against Lone Star.

The five charges against plaintiffs were (1) failure to include an alarm agent's registration number on two separate contracts (§§ 7599.61, subd. (b), 7599.54, subd. (a)), (2) failure to verify an alarm agent's registration (§§ 7599.61, subd. (b), 7598.16, 7599.39; Cal. Code Regs., tit. 16, § 625.1), (3) aiding and abetting an unregistered alarm agent (§§ 7599.61, subd. (b), 7590.2, 7592.2, 7599.46, 7599.47, 7598.51; Cal. Code Regs., tit. 16, § 607.4, subds. (a) & (b)(1), (2)), (4) making untrue or misleading statements (§§ 7599.61, subd. (b), 7592.2, 7599.55), and (5) engaging in dishonest or fraudulent acts (§§ 7592.2, 7599.61, subd. (j).) The sixth charge, filed against Boyer only, alleged he had not paid the costs ($2,570) imposed in the 2006 administrative proceeding.

At the administrative hearing, the Bureau based its findings of fact primarily on the testimony of two witnesses, business owner Heide Dewitt and residential customer Rhonda Fuertado.

### 1. *Dewitt's Testimony*

Dewitt testified that Lone Star's unlicensed agent, Roy Steven Ashcraft, visited her business in early 2008 and presented her with a business card bearing his name, the title "Field Supervisor," Lone Star's logo, and Lone Star's license number. Dewitt further testified that Ashcraft (1) reviewed paperwork related to alarm company services being provided for Dewitt's business by another security company, Protection One; (2) informed Dewitt that she did not have an existing contract with Protection One; (3) gave her a blank contract for Lone Star's services, which Dewitt did not sign; and (4) took a $70 check from Dewitt, agreeing that he would not cash the check unless Dewitt verified that she was not contractually bound to Protection One. The next day Dewitt called Ashcraft and informed him that she was bound by the contract with Protection One until September 2008 and that she was therefore unable to enter into a contract with Lone Star. Dewitt sent a followup letter verifying her conversation with Ashcraft as well as her request to cancel the agreement with Lone Star based on the binding contract she had with Protection One.

Boyer, acting on behalf of Lone Star, responded to Dewitt by fax with a counter proposal that Lone Star commence service in August 2008. Dewitt responded to Boyer in writing, reiterated her desire to cancel the agreement with Lone Star, and demanded that Boyer return her $70 check. Plaintiffs failed to return Dewitt's deposit, maintaining that they had a binding contract with Dewitt. After repeatedly contacting plaintiffs in writing and by telephone to demand the return of her deposit check, Dewitt filed a complaint with the Bureau. Boyer returned Dewitt's check just prior to the Bureau hearing and called Dewitt several times asking her to withdraw her complaint.

The ALJ found that Dewitt had not signed a contract for services with Lone Star and noted discrepancies between the version of the Lone Star contract Dewitt submitted and the signed contract Lone Star produced.

### 2. *The Fuertados' Testimony*

Rhonda Fuertado testified that she contacted Lone Star by telephone in April 2009 because she wanted to have a wireless alarm system installed in her home. Ashcraft visited her on April 1, 2009, and took a deposit check for $264 after she signed a contract for three years of alarm monitoring services and the installation of a wireless alarm system. Rhonda testified that she would not have entered into the contract had she known it covered a three-year term and that Ashcraft informed her the contract was for one year. Ashcraft said that a wireless alarm system would be installed in the Fuertados' home two days later, on Friday, April 3, 2009. The Fuertados did not request the April 3 installation date and did not sign an agreement waiving their 72-hour right of rescission. When the Fuertados contacted Boyer both by telephone and in writing to request a refund of their deposit, Boyer responded that the Fuertados had requested an "emergency installation" and therefore had no right to cancel. After the Fuertados complained to the Bureau, Boyer sent the Fuertados a letter and refund check, informing them that he had not known about their refund request prior to that time.

The ALJ sustained all six charges, revoked Lone Star's alarm company license and Boyer's probationary qualified manager certificate and ordered them to pay the Bureau $15,864.84 in costs within 60 days. The director adopted the ALJ's decision effective July 1, 2010.

Lone Star and Boyer petitioned the trial court for a writ of administrative mandate. (See Code Civ. Proc., § 1094.5.) The trial court granted the petition as to charges one, two, and three, concluding there was a fatal variance between the charges and the Bureau's evidence. The trial court concluded there was sufficient evidence to uphold the fourth charge (making untrue or misleading statements) and the fifth charge (engaging in dishonest or fraudulent acts) as to both Lone Star and Boyer. It also found that Boyer had failed to pay the costs imposed in the 2006 administrative proceeding. The trial court declined to set aside the Bureau's revocation of Lone Star's license and the revocation of Boyer's probation, which had the effect of lifting the previous stay of the revocation of Boyer's certificate. Judgment was entered accordingly.

## II

## DISCUSSION

On appeal, plaintiffs argue that the trial court erred in finding that the Bureau's decision was supported by substantial evidence as to the fourth and fifth charges. We disagree. Substantial evidence supports the trial court's decision.

### A. *Standard of Review*

" ' " 'The right to practice one's profession is a fundamental vested right and if a person's license to practice that profession is revoked by an administrative agency, when a petition for a writ of mandate is brought for restoration of the license, the trial court must apply its independent judgment to its review of the facts underlying the administrative decision. . . .' " '

" ' " 'Under the independent judgment rule, the trial court must weigh the evidence and make its own determination as to whether the administrative findings should be sustained. When an appeal is taken from the trial court's determination, it is given the same effect as any other judgment after trial rendered by the court: the only question is whether the *trial court's* (not the administrative agency's) findings are supported by substantial evidence. . . . Conflicts in the evidence must be resolved in favor of the judgment and where two or more inferences can be reasonably drawn from the facts, the reviewing court must accept the inferences deduced by the trial court.' . . . However, '. . . the trial court's legal conclusions are open to our examination to determine if errors of law were committed.' . . .

" ' " 'Evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible and of solid value.' . . . Additionally, a reviewing court 'may look to the findings in [the administrative agency's] decision for guidance in determining whether the trial court's judgment is supported by substantial evidence.' . . ." ' " (*Sandarg v. Dental Bd. of California* (2010) 184 Cal.App.4th 1434, 1440 [109 Cal.Rptr.3d 826], citations omitted.)

### B. *Burden of Proof on the Bureau*

As a preliminary matter, plaintiffs contend the Bureau had to base its findings of fact on clear and convincing evidence. The law is to the contrary.

 " 'Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.' . . . In determining the

proper standard of proof to apply in administrative license revocation proceedings, courts have drawn a distinction between professional licenses such as those held by doctors . . . , lawyers . . . , and real estate brokers . . . [,] on the one hand, and nonprofessional or occupational licenses such as those held by food processors . . . and vehicle salespersons . . . , on the other hand. In proceedings to revoke professional licenses, the decision makers apply the clear and convincing evidence standard of proof, while in proceedings to revoke nonprofessional or occupational licenses, the decision makers apply the preponderance of the evidence standard of proof.

"The 'sharp distinction between professional licenses, on the one hand, and . . . nonprofessional licenses, on the other, supports the distinction in the standards of proof applicable in proceedings to revoke these two different types of licenses. Because a professional license represents the licensee's fulfillment of extensive educational, training and testing requirements, the licensee has an extremely strong interest in retaining the license that he or she has expended so much effort in obtaining. It makes sense to require that a higher standard of proof be met in a proceeding to revoke or suspend such a license. The same cannot be said for a licensee's interest in retaining a [nonprofessional] license.' " (*Imports Performance v. Department of Consumer Affairs, Bureau of Automotive Repair* (2011) 201 Cal.App.4th 911, 916 [135 Cal.Rptr.3d 402], citations omitted.) "A 'professional' is '[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency.' " (*Id.* at p. 916, fn. 5.)

To take an example, an "advanced emission specialist technician" is not a professional, and an agency may revoke the technician's license without clear and convincing evidence. "Although an applicant for an advanced emission specialist technician license must complete certain course work . . . and pass an examination . . . , such requirements are not similar to the 'extensive educational, training and testing requirements' necessary to obtain a professional license . . . . Accordingly, an advanced emission specialist technician license is a nonprofessional or occupational license and proceedings to revoke such a license are governed by the preponderance of evidence standard of proof." (*Imports Performance v. Department of Consumer Affairs, Bureau of Automotive Repair, supra,* 201 Cal.App.4th at pp. 916–917, citations & fn. omitted.)

As appellants, Lone Star and Boyer had to establish that the Bureau was required to base its findings of fact on clear and convincing evidence. (See *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 311 [140 Cal.Rptr.3d 459]; *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1323 [96 Cal.Rptr.3d 813]; *Kuperman v. San Diego County Assessment Appeals Bd. No. 1* (2006) 137

Cal.App.4th 918, 931 [40 Cal.Rptr.3d 703].) But they have not done so. (See §§ 7598.1, 7598.2 [discussing course of training required for employees of licensees under the Act], 7599 [listing prerequisites for qualified manager certificate].)

Further, in the administrative decision now being reviewed, the Bureau did not revoke Boyer's qualified manager certificate. His certificate was revoked in the 2006 administrative process, but the revocation was stayed pending his completion of three years of probation. Thus, the question before the Bureau in the present proceeding was whether to revoke Boyer's *probation*, not his certificate.

As Division Three of this district has explained: "[The licensee] correctly points out that the standard of proof to revoke a professional *license* is clear and convincing evidence. . . . But that . . . standard did not apply to the board's petition to revoke [the licensee's] *probation*.

"The courts have addressed a similar issue in criminal cases. The standard of proof in a criminal case is, of course, beyond a reasonable doubt. . . . However, once a convicted criminal is placed on probation, the government is not required to prove beyond a reasonable doubt that he or she violated the terms of probation in order [to] revoke probation. Rather, the 'standard of proof required for revocation of probation is a preponderance of evidence to support the violation.' . . .

"The same analysis applies here. While the board is required to prove the allegations in an accusation by clear and convincing evidence, it is only required to prove the allegations in a petition to revoke probation by a preponderance of the evidence." (*Sandarg v. Dental Bd. of California, supra,* 184 Cal.App.4th at p. 1441, citations omitted, italics added.)

Notwithstanding the lower burden of proof on an administrative agency in revoking a nonprofessional or occupational license, the Bureau actually based its findings of fact as to Lone Star on clear and convincing evidence. But the Bureau properly applied a lower standard of proof in deciding whether to revoke Boyer's probation.

C. *Substantial Evidence*

Plaintiffs argue the Bureau failed to present sufficient evidence that they made untrue or misleading statements (the fourth charge) or that they engaged in dishonest or fraudulent acts (the fifth charge). Although plaintiffs admit that Ashcraft was their agent, they argue his authority was limited, and they are not responsible for his dishonest statements or acts. In their opening

brief, plaintiffs state that "critical elements of the [Bureau's] case against [them] were unsupported by any evidence, substantial or otherwise."

### 1. *Untrue or Misleading Statements*

The trial court found plaintiffs made untrue or misleading statements. Plaintiffs argue that this finding was not supported by substantial evidence. We disagree.

According to the trial court, plaintiffs knowingly "engaged" an unlicensed alarm company operator, Ashcraft, with whom plaintiffs conspired to violate the Act.[1] The applicable provision of the Act states: "Any person who . . . knowingly engages an unlicensed alarm company operator after being notified in writing by the bureau of the alarm company operator's unlicensed status with the bureau, is guilty of a misdemeanor, and is punishable by a fine of one thousand dollars ($1,000), or by imprisonment in the county jail for not more than one year, or by both such fine and imprisonment." (§ 7592.2.)

Plaintiffs contend the Bureau failed to prove the existence of a conspiracy because it did not proffer any evidence "purporting to demonstrate that prior written notice was ever provided to Lone Star or to Boyer concerning any alarm company operator's status as licensed or unlicensed." But letters directly contradicting this assertion are found in the administrative record. For example, Boyer confirmed he knew about Ashcraft's unlicensed status in a letter he sent to the Bureau dated August 12, 2008. Boyer wrote: "As to license requirements[,] let us review: Employees are required to be . . . licensed Alarm Agent[s]. Mr. Ashcraft is not an [e]mployee of this company, nor has he ever been one. If you will process his application as an [a]larm [a]gent without his being an employee of this firm, *I will request that he renew his license*." (Italics added.) A letter from the Bureau's field representative, dated September 25, 2002, provides additional evidence that Boyer conducted business through unlicensed individuals. The letter stated: "Thank you for meeting with me on September 12, 2002 to discuss complaints pending against your company. . . . [¶] We . . . discussed the complaint we received in [a] case . . . alleging you use unlicensed installers and technicians and are paying them as independent contractors." The letter continues: "As you have requested, I am sending you a formal request to provide us with the names and registration numbers of the individuals you have contracted with

---

[1] "An 'alarm company operator' means any person who, for any consideration whatsoever, engages in business or accepts employment to install, maintain, alter, sell on premises, monitor, or service alarm systems or who responds to alarm systems except for any alarm agent. 'Alarm company operator,' includes any entity that is retained by a licensed alarm company operator, a customer, or any other person or entity, to monitor one or more alarm systems . . . ." (§ 7590.2.) Here, Ashcraft was an unlicensed alarm company operator.

in the last two quarters to [do any of the following:] sell, install, service, or repair an alarm system." The record therefore contains sufficient evidence to establish that Lone Star and Boyer conspired to "engage" an unlicensed alarm company operator, namely, Ashcraft.

Plaintiffs raise two issues related to the trial court's determination that sufficient evidence supported the finding they made untrue or misleading statements. First, the Act states that only a "licensee" must refrain from making untrue or misleading statements (§ 7599.55), and although Lone Star was a "licensee," Ashcraft was unlicensed.[2] Thus, so the argument goes, anything Ashcraft said to Dewitt or the Fuertados did not constitute an untrue or misleading statement on the part of Lone Star or Boyer. Second, the Act applies only to "misleading statements concerning objectively verifiable facts," and objectively verifiable facts include only present, existing facts and not an intention to breach a promise in the future.

Plaintiffs' first contention is easily refuted. The trial court found that plaintiffs hired Ashcraft as an independent contractor knowing he was unlicensed. Further, Ashcraft made untrue or misleading statements while obtaining customers for Lone Star. Plaintiffs admit, as they should, that Ashcraft was their agent. (See *City of Los Angeles v. Meyers Bros. Parking System, Inc.* (1975) 54 Cal.App.3d 135, 138–139 [126 Cal.Rptr. 545]; *APSB Bancorp v. Thornton Grant* (1994) 26 Cal.App.4th 926, 929–930 [31 Cal.Rptr.2d 736].) Consequently, plaintiffs could be held responsible, in disciplinary proceedings, for what Ashcraft said and did when he was soliciting business on their behalf.

■ Plaintiffs' second contention, which would unduly narrow the meaning of "untrue or misleading statements," fails because the Act mandates a broad definition of that phrase. " 'The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " (*Baker v. Workers' Comp. Appeals Bd.* (2011) 52 Cal.4th 434, 446 [129 Cal.Rptr.3d 133, 257 P.3d 738].) The Act's objective is to protect the public by requiring licensing and certificates for alarm companies and their managers. (See §§ 101.6, 145.) For example, section 7599.55 reflects a broad definition of "untrue or misleading statements." That statute provides: " 'Untrue or misleading statements' *include, but are not limited to*, a representation by an alarm company operator . . . that: [¶] (a) An alarm system is 'Underwriters Laboratory approved or listed' (UL approved or listed) unless the entire system, and not only one or more components, is in fact, UL approved or listed"; or [¶] "(b) An alarm system is

---

[2] Under the Act, a "licensee" is an "alarm company operator." (See §§ 7593, 7599.55, 7590.1, subd. (i); see also fn. 1, *ante*.) Here, Lone Star is the licensee.

insurance approved, police approved, or approved by the Department of Defense, unless in fact the approval has been obtained in writing." (Italics added.) Plaintiffs contend these examples demonstrate that the Legislature intended to limit "untrue or misleading statements" to current and verifiable facts. ■ But that crabbed interpretation ignores the prefatory language of the statute—"include, but are not limited to"—and would undermine the Act's purpose to protect the public. (See §§ 101.6, 145.) A knowingly false statement about a licensee's future performance is inconsistent with that purpose.

### 2. *Dishonest or Fraudulent Acts*

The trial court found that substantial evidence supported the Bureau's finding that plaintiffs violated section 7599.61, subdivision (j) of the Act, which states: "The director may suspend or revoke an alarm company operator license [or] a qualified manager certificate . . . if the director determines that the licensee or his or her manager . . . [or] any of its officers, partners, employees, or its manager, has: [¶] . . . [¶] . . . [c]ommitted any act in the course of the licensee's business constituting dishonesty or fraud." (§ 7599.61.)

Plaintiffs contend that violations of the Act for dishonesty or fraud require an evidentiary showing of their subjective intent to deceive customers or, in the case of promises about future performance, knowledge and intent that their promises would not be performed. According to plaintiffs, Dewitt and the Fuertados complained to the Bureau about *oral* statements made by Ashcraft, but the Lone Star contract contained an integration clause rendering oral statements unenforceable. This contention is beside the point. The Bureau's disciplinary proceedings are not intended to determine the legality of a licensee's contract but to decide whether a licensee or certificate holder has made a dishonest or fraudulent statement. Regardless of the provisions of Lone Star's contract, Ashcraft's oral statements could still constitute dishonest or fraudulent communications if he made them knowing they contradicted the written agreement.

■ " 'Fraud' and 'dishonesty' are closely synonymous. Fraud is defined as 'a dishonest stratagem.' . . . It 'may consist in the misrepresentation or the concealment of material facts' . . . , or a statement of fact made with 'conscious[ness] of [its] falsity.' . . . And it is the universally recognized rule that: ' "It is not essential to liability that the person charged with fraud should have received any benefit therefrom . . . ." ' . . . "Liability is predicated upon the fact that [another] has been misled to his prejudice, and not that defendant has profited by his wrong." ' " (*Fort v. Board of Medical Quality Assurance* (1982) 136 Cal.App.3d 12, 19–20 [185 Cal.Rptr. 836], citations omitted.)

"The term 'dishonesty' has been defined in . . . disciplinary proceedings as follows: ' "Dishonesty" necessarily includes the element of bad faith. As defined in the dictionaries and in judicial decisions, it means fraud, deception, betrayal, faithlessness. . . . " 'Dishonesty' denotes an absence of integrity; a disposition to cheat, deceive, or defraud; deceive and betray." ' " (*Small v. Smith* (1971) 16 Cal.App.3d 450, 456 [94 Cal.Rptr. 136], citations omitted.)

As the trial court noted, Lone Star's contract did not disclaim responsibility for an agent's breaking a promise to hold a check until a customer could verify whether she wanted to enter into a contract with Lone Star, as was the case with Dewitt. Further, the trial court noted that Boyer actively participated in the refusal to cancel the Fuertado contract and refund their deposit. When the Fuertados contacted Boyer by telephone, he refused to refund their deposit even though Ashcraft falsely told them they were signing a one-year contract; the contract indicated it lasted three years. But after the Fuertados complained to the Bureau, Boyer promptly sent them a letter and refund check, saying he knew nothing about their refund request *prior to that time*. Simply put, Boyer lied.

The record includes written evidence that contradicts plaintiffs' claim that they had no knowledge of or culpability for dishonest or fraudulent acts. In a letter dated February 4, 2008, Dewitt informed plaintiffs that "Roy Ashcraft was in my store on 1-23-08. He looked at the paper work I had and told me I did not have a contract with [P]rotection [O]ne." Dewitt later explained to plaintiffs that she wanted a refund of her deposit and to cancel the contract with Lone Star because she was still bound by her agreement with Protection One. After additional correspondence between Dewitt and plaintiffs, Boyer sent Dewitt a letter dated March 26, 2008, stating he had "chosen not to accept [her cancelation]." The ALJ at the hearing found that Dewitt's unsigned contract and Boyer's signed contract did not match in several respects, including the placement of signatures and other markings. The ALJ found Dewitt to be a credible witness and concluded that plaintiffs had submitted a forged contract. "[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the trial court's determination that these witnesses were credible." (*Estate of Odian* (2006) 145 Cal.App.4th 152, 168 [51 Cal.Rptr.3d 390].)

In sum, documentary evidence and testimony found credible by the ALJ established that plaintiffs made untrue or misleading statements and committed dishonest or fraudulent acts in violation of the Alarm Company Act. It follows that the trial court's denial of plaintiffs' petition on charges four and five of the amended accusation was supported by substantial evidence.

## III

## DISPOSITION

The judgment is affirmed.

Rothschild, J., and Chaney, J., concurred.