Filed 12/26/14  Guillen v. County of Riverside CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| APRIL GUILLEN,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF RIVERSIDE et al.,<br><br>     Defendants and Respondents. | E058883<br><br>(Super.Ct.No. RIC1207164)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed.

April Guillen, Plaintiff and Appellant in pro. per.

Ferguson, Praet & Sherman and Anthony M. Snodgrass for Defendants and

Respondents.

April Guillen was terminated from her position as Community Services Officer

with the Riverside County Sheriff's Department.  She requested arbitration pursuant to

the applicable memorandum of understanding (MOU).  The arbitrator then found that she

had been properly terminated for misconduct.  In a mandate proceeding, the trial court,

1

exercising its independent judgment, found that she had committed misconduct; it also found that the penalty of termination was not an abuse of discretion.

Guillen appeals. Finding no error, we will affirm.

I

FACTUAL BACKGROUND

The Riverside County Sheriff's Department (Department) hired Guillen in 2000. In 2002, she was promoted to Community Service Officer (CSO), an unsworn position. Her 2006, 2007, and 2008 overall performance ratings were "[m]eets [s]tandard."

Guillen and Deputy Justin Van Sickle both worked at the Hemet Station. On July 20, 2009, Van Sickle was arrested and booked for spousal battery. At the same time, an emergency protective order (EPO) was issued against him that barred him from entering his own house. On July 21, 2009, he was released on bail.

On August 10, 2009, at a hearing on a temporary restraining order (TRO), Van Sickle admitted that, while the EPO was in effect, he had had a "friend" enter his home, remove personal items, and take his car.

On August 13, 2009, the Sheriff's Administrative Investigations Unit (AIU) interviewed Van Sickle. During that interview, he identified the "friend" as Guillen.

Accordingly, also on August 13, 2009 — indeed, while Van Sickle's interview was still going on — two AIU officers interviewed Guillen. She was told that the purpose of the interview was to discuss allegations of misconduct against Van Sickle. She was also told, "At this time, there are no allegations of misconduct against you, but I

2

am going to give you an administrative order to answer all questions accurately, completely, and truthfully."

A.      *Entry into Van Sickle's House*.

In the interview, Guillen said that, when she heard that Van Sickle had been arrested, she texted him, saying, "I'm here for you if you need anything.  Give me a call.  I'm concerned about you."

When Van Sickle got out of jail, he phoned her and asked her to pick him up.  She complied.  He told her "he got arrested for some stuff, and . . . he can't talk about it, but . . . he didn't do it."  He also told her about the EPO.

Over the next seven days, while the EPO was in effect, she "hung out" with Van Sickle for at least a few hours each day.  She let him use her car.  She went to his house several times to feed his dogs, which were out in the yard.

On July 23 or 24, she entered his house, with the help of a locksmith, to retrieve some clothes, his car keys, and his car.  He told her to leave if she saw a white Toyota Corolla, because that was his girlfriend's car.  She did not see one, so she believed no one was home, though she admitted that she did not know for sure.

Chief Deputy Wagner, who made the decision to terminate Guillen, testified that the act of entering Van Sickle's home when Van Sickle was subject to the EPO, standing alone, would have resulted in a minimum of a written reprimand or a maximum of an eight-hour suspension.

B.     *Voicemail from Van Sickle.*

During her interview, when asked if she had "spoken" with Van Sickle that day, Guillen responded:

"CSO APRIL GUILLEN:  Does voice mail count as contacting?

"LIEUTENANT PRICE:  What did you — what message did you leave in the voice mail?

"CSO APRIL GUILLEN:  No.  No.  He said that he had to give my name in the AIU interview, so that you guys might be talking to me.

"LIEUTENANT PRICE:  And what else did the voice mail say?

"CSO APRIL GUILLEN:  That was it.

"INVESTIGATOR GRIMM:  Do you still have that voice mail?

"CSO APRIL GUILLEN:  (Inaudible.)

      "(short pause)

"INVESTIGATOR GRIMM:  Can we check your phone for that voice mail?

"CSO APRIL GUILLEN:  Yes."

After a recess, Investigator Grimm stated for the record that Guillen had told them that she had erased the voicemail.  In further discussion of the voicemail, Guillen reaffirmed several times that Van Sickle had left her a voicemail, and that in it, he said "that he had to tell them my name, because I went over to his house for the EPO. . . .  I might get interviewed."

After some unrelated questioning, there was this exchange:

4

"LIEUTENANT PRICE: Okay. I'm going to ask you a tough question. He's telling us that he did not leave you a voice mail. Is that a truthful response from him?

"CSO APRIL GUILLEN: Yes.

"LIEUTENANT PRICE: What's that?

"CSO APRIL GUILLEN: Yes, that's true. I don't want to lie.

"LIEUTENANT PRICE: Okay. It's — you're telling me that he's telling the truth, and you're telling a lie?

"CSO APRIL GUILLEN: Yes.

"LIEUTENANT PRICE: Okay. Let me ask this question . . . — how would you know, that he had dropped your name because you had to go over for the EPO and you may have to be interviewed?

"CSO APRIL GUILLEN: Because he was telling me when he had — when they scheduled his AIU interview — because he had a TRO hearing, and one of the things that came up about the TRO hearing was how he got his car, so he didn't know if that was going to be something that they were going to ask, and — in the AIU interview, and if they did, he was going to try and keep my name out of it, but if they asked for my name, he would have to give it to them — give it to you guys.

"LIEUTENANT PRICE: Okay. April, why don't you just tell me the truth?

"CSO APRIL GUILLEN: Well, because I don't know if that means he was talking about the case when he was telling me about the TRO hearing.

5

"LIEUTENANT PRICE: No. that — that's not — the question is, did he leave you a voice mail? I don't care what he —

"CSO APRIL GUILLEN: No. He didn't. He didn't leave it."

Guillen then repeatedly reaffirmed that Van Sickle had not left her a voicemail.

Toward the end of the interview, there was this colloquy:

"LIEUTENANT PRICE: . . . [A]t the very beginning of the interview, I gave you an administrative order that you needed to tell us the truth, and have you told us the truth throughout this interview?

"CSO APRIL GUILLEN: Yes, and the reason why I didn't (inaudible) message was I'm afraid that him telling me about the TRO was talking about the case.

"INVESTIGATOR GRIMM: So you haven't told us the whole truth?

"CSO APRIL GUILLEN: I lied about the message. [¶] . . . [¶] . . .

"LIEUTENANT PRICE: Why did you lie?

"CSO APRIL GUILLEN: Because I was scared.

"LIEUTENANT PRICE: Scared of —

"CSO APRIL GUILLEN: I didn't want Justin to lose his job for the TRO thing."

Finally, there was this dialogue:

"LIEUTENANT PRICE: . . . [Y]ou're going to be placed on paid administrative leave. I didn't know if you knew that was coming or not but —

"CSO APRIL GUILLEN: No, I didn't.

"LIEUTENANT PRICE: And do you understand why?

6

"CSO APRIL GUILLEN:  Probably because I lied."

Before the arbitrator, Guillen admitted that she "lied" when she said Van Sickle left her a voicemail.  Thus, she claimed that, when she said Van Sickle did not leave her a voicemail, she "came forth with the truth."

Chief Deputy Wagner testified that this instance of dishonesty, standing alone, was cause for termination.

C.      *Calling in Sick.*

According to Department records, Guillen took sick leave on Wednesday, July 22 and Saturday, July 25.

When asked about Wednesday, July 22, Guillen volunteered:

"CSO APRIL GUILLEN:  I know I called in sick that day.  I know I'll probably get in trouble for that.

"LIEUTENANT PRICE:  You called in sick to help this guy out?

"CSO APRIL GUILLEN:  Yep."

Later, there was this exchange:

"LIEUTENANT PRICE:  . . . [L]et's back up a little bit.  You said that you called in sick to help this guy out?

"CSO APRIL GUILLEN:  Yeah.

"LIEUTENANT PRICE:  And you weren't really sick?

"CSO APRIL GUILLEN:  No."

On the night of July 24-25, Guillen was involved in an on-duty traffic collision (TC). Regarding Saturday, July 25, she was asked:

"INVESTIGATOR GRIMM: . . . D[id] you work . . . Saturday afternoon?

"CSO APRIL GUILLEN: Nope. I called in sick.

"INVESTIGATOR GRIMM: Okay. Saturday you called in sick — Saturday afternoon?

"CSO APRIL GUILLEN: Yeah.

"LIEUTENANT PRICE: . . . [W]ere you sick?

"CSO APRIL GUILLEN: I was pretty darn tired.

"LIEUTENANT PRICE: Okay. But were you sick?

"CSO APRIL GUILLEN: No.

"LIEUTENANT PRICE: And did you ever call in sick just so you felt from that?

"CSO APRIL GUILLEN: No. I called in sick, because I was tired, and I didn't feel like getting crap about the TC."

Chief Deputy Wagner testified that misuse of sick leave, standing alone, would be cause for termination.

The MOU did not expressly state when or under what circumstances sick leave could be used.

Before the arbitrator, Guillen testified that when she called in, she made it clear that she was not coming in because she was "tired." She had been diagnosed with partial

8

complex epilepsy, and "one of the things that c[ould] trigger [her] seizures [wa]s being extremely tired."

## II

## PROCEDURAL BACKGROUND

On September 23, 2009, the Department sent Guillen a notice of intent to terminate her. The stated grounds included:

1. "Insubordination";

2. "Dishonesty";

3. "Willful violation of an employee regulation . . ."; and

4. "Conduct . . . which adversely affects the employee's job performance or operation of the department in which they are employed."

The notice cited the following general orders:

1. "The failure . . . of any member to obey an order given by a superior officer of the Department shall be deemed insubordination. Insubordination may be cause for dismissal from the Department."

2. "Department members shall speak the truth at all times whether under oath or not."

3. "Department members, whether on or off duty, shall be governed by the ordinary rules of good conduct and behavior."

4. "While on or off duty, Department members shall obey all federal, state and local laws and ordinances, and all activities conducted by a Department member shall be performed in a lawful and appropriate manner."

5. "Department members shall report for duty promptly and properly at the time specified by their supervisors."

On October 13, 2009, after a *Skelly* hearing,[1] Guillen was terminated.

She appealed, but after an evidentiary hearing, the arbitrator upheld her termination. The arbitrator found that Guillen had committed misconduct by:

1. Lying in the interview about whether Van Sickle left her a voicemail;

2. Misusing sick leave; and

3. "[V]iolat[ing] the General Orders and demonstrat[ing] poor judgment when she entered Deputy Van Sickle's residence."

Regarding the level of discipline, the arbitrator found that "[Guillen]'s dishonesty constituted just cause to terminate [her]." He explained, in part, that "[Guillen]'s dishonesty constituted an egregious breach of her obligation to tell the truth and negatively impacted on her ability to testify in court."

He further found that, while "[Guillen]'s decision to enter Deputy Van Sickle's residence with the assistance of a locksmith at a time when she knew that . . . there was

---

[1]    A *Skelly* hearing is an opportunity for an employee to respond to the decision maker regarding the charges against him or her. (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206.)

an EPO that precluded Deputy Van Sickle from entering . . . would not support termination by itself, it was part of her misconduct that must be considered."

Guillen sought review by filing a petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5.) She named the arbitrator (Mark Burstein) as respondent and the County of Riverside and the Department as real parties in interest. After hearing argument, the trial court denied the petition. It stated:

"The Court finds that the weight of the evidence supports the finding that [Guillen] was dishonest in her testimony regarding the voicemail from Deputy Justin Van Sickle. The Court further finds that the weight of the evidence supports the finding that [Guillen] misused sick leave,[2] and entry into Deputy Justin Van Sickle's residence showed a lack of good conduct and behavior, showed poor judgment, and was inappropriate. [¶] Finally, the Court finds that the punishment of termination is not an abuse of discretion, even if we base it solely on the finding of dishonesty."

It entered judgment accordingly.

### III

### THE SUFFICIENCY OF THE EVIDENCE OF MISCONDUCT

Guillen contends that the arbitrator's findings that she committed misconduct by being dishonest in the interview and by misusing sick leave are not supported by the

---

**2** Somewhat confusingly, both before and after making this statement, the trial court indicated that it did *not* find sufficient evidence that Guillen misused sick leave.

11

evidence. She does not challenge the finding that she committed misconduct by entering Van Sickle's house; she merely argues that — as Chief Deputy Wagner admitted, and as the trial court found — this finding was insufficient, standing alone, to support the penalty of termination.

A. *Standard of Review*.

Guillen's attack on the arbitrator's findings is somewhat misdirected. At this point, the only findings open to attack are those of the trial court.

"It repeatedly has been held that '[d]iscipline imposed on public employees affects their fundamental vested right in employment,' and therefore, when a public employee challenges an employer's disciplinary action in a mandamus proceeding, the trial court is required to exercise its independent judgment on the evidence. [Citations.]" (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 314.)

"The independent judgment test require[s] the trial court to not only examine the administrative record for errors of law, but also exercise its independent judgment upon the evidence in a limited trial de novo. [Citation.] The trial court [i]s permitted to draw its own reasonable inferences from the evidence and make its own credibility determinations. [Citation.] At the same time, it ha[s] to afford a strong presumption of correctness to the administrative findings and require the challenging party to demonstrate that such findings were contrary to the weight of the evidence. [Citation.]" (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407.)

12

"On appeal, we do not exercise our independent judgment. We review the trial court's findings under the substantial evidence test and determine whether substantial evidence supports the trial court's conclusions. [Citations.] We must resolve all conflicts in the evidence, and indulge all reasonable inferences, in favor of the superior court's judgment. [Citations.]" (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 574-575.)

B.      *Dishonesty About the Voicemail from Van Sickle.*

"'The term "dishonesty" has been defined in . . . disciplinary proceedings as follows:  "'Dishonesty' necessarily includes the element of bad faith. As defined in the dictionaries and in judicial decisions, it means fraud, deception, betrayal, faithlessness . . . .  '"Dishonesty" denotes an absence of integrity; a disposition to cheat, deceive, or defraud; deceive and betray.'"' [Citation.]" (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2012) 209 Cal.App.4th 445, 458.)

Guillen argues that dishonesty is synonymous with common-law fraud; thus, it requires not only a false representation, but also scienter, materiality, intent to defraud, justifiable reliance, and resulting damages. (See *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990 [elements of fraud].) She cites no authority for this position, and we are not convinced. An employer should not have to overlook an employee's attempt to deceive it merely because the attempt failed; hence, reliance and damages are not required.

13

We may assume, without deciding, that scienter, materiality, and intent to defraud are all required. Even if so, there was sufficient evidence of all three elements here. Initially, Guillen said Van Sickle left her a voicemail. Then she said she had lied and he did not. These could not both be true; it is tautological that she made a false representation.

Guillen wants to argue that, because, before the interview was over, she changed her story and admitted that she had lied, she was not dishonest in the interview as a whole. Preliminarily, we note that there was powerful evidence that her *first* story was the truth, and her *second* story was the lie. Van Sickle had been ordered not to talk to anyone about his investigation. Also, Lieutenant Price had just told Guillen (perhaps falsely) that Van Sickle had denied leaving her a voicemail. Thus, she would have believed that, by saying that he did leave her a voicemail, she was getting him into trouble. Significantly, she could not credibly explain how she knew that Van Sickle had given her name in his interview, unless she had actually received the voicemail. On this view, the lie was material, made with scienter, and made with the intent to defraud, because it was intended to conceal Van Sickle's dishonesty and insubordination.

We do not rest our opinion on this ground, however, because the trial court specifically found that the first story was the lie and the second story was the truth. Even if so, however, there was still sufficient evidence of scienter and intent to defraud. Guillen admitted that she lied on purpose, because she was afraid that Van Sickle would lose his job if she told the truth. There was also sufficient evidence of materiality.

14

Whether Van Sickle violated an order not to talk to anybody about the investigation, and whether he lied in his interview, were both material to his investigation; this was equally true regardless of whether Guillen falsely said that he did or falsely said that he did not.

We therefore conclude that there was sufficient evidence to support the trial court's finding that Guillen was dishonest about the voicemail in the interview.

C. *Misuse of Sick Leave*.

Guillen also contends there is insufficient evidence to support the finding that she misused sick leave.

We do not address this contention because — while the trial court's findings were admittedly ambiguous — it appears to have found insufficient evidence that Guillen did misuse sick leave.

IV

TERMINATION AS THE APPROPRIATE PENALTY

Guillen contends that the findings do not support the conclusion that termination was an appropriate penalty.

The arbitrator found that the termination was appropriate based on dishonesty alone. The trial court similarly found that the termination was justified, even if based solely on Guillen's dishonesty during the interview.

"'"'"The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated . . . . Neither an appellate court nor a trial court is free to substitute its discretion for that of the

15

administrative agency concerning the degree of punishment imposed.' [Citations.]"
[Citation.]' [Citation.]" (*Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 283-284 [Fourth Dist., Div. Two].) In this case, the penalty that the arbitrator found appropriate is effectively the penalty imposed by the administrative body. (See *Quintanar v. County of Riverside* (2014) 230 Cal.App.4th 1226, 1233-1235 [Fourth Dist., Div. Two] [under similar MOU, in appeal to arbitrator from administrative decision to terminate employment, arbitrator exercises independent judgment on penalty].)

"' . . . In considering whether an abuse of discretion occurred in the discipline of a public employee, the overriding consideration is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, harm to the public service. Other factors include the circumstances surrounding the misconduct and the likelihood of its recurrence.' [Citation.] In weighing such factors, the court considers the nature of the employee's profession, 'since some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields. [Citation.]' [Citation.]" (*Cate v. California State Personnel Bd.*, *supra*, 204 Cal.App.4th at pp. 284-285.) "More specifically, dishonesty by law enforcement personnel is treated harshly. [Citations.]" (*Id*. at p. 285.)

"Discretion is abused where the penalty imposed exceeds the bounds of reason; the fact reasonable minds may differ as to the propriety of the penalty supports a finding the [administrative body] acted within its discretion. [Citation.]" (*Paulino v. Civil Service Com.* (1985) 175 Cal.App.3d 962, 970-971.)

Guillen cites *Blake v. State Personnel Board* (1972) 25 Cal.App.3d 541 [Fourth Dist., Div. Two], in which a male deputy labor commissioner, while attending a convention, pointed a gun at two male coworkers and told them to "stay away" from a certain female coworker. (*Id*. at pp. 546-547.) A two-justice majority of this court held that termination was an excessive penalty, in light of the employee's long record of exemplary service, the lack of evidence of any actual impact on the individuals' work relations, the fact that the whole group had been drinking, and the fact that the employee had apologized and taken steps to prevent any recurrence. (*Id*. at p. 554.)

It has been held that *Blake* is not controlling in a case "involve[ing] intentional dishonesty by a peace officer." (*Paulino v. Civil Service Com.*, *supra*, 175 Cal.App.3d at p. 972.) "A deputy sheriff's job is a position of trust. A deputy sheriff is held to the highest standards of behavior. His [or her] honesty and credibility are crucial to proper performance of his duties. Dishonesty in matters of public trust is intolerable. [Citation.]" (*Id*. at p. 972.) While Guillen was not a sworn deputy, her position as an unsworn CSO similarly entailed drafting truthful reports and testifying truthfully in court. We also note that, in contrast to the employee in *Blake*, Guillen does not have a long record of outstanding service and has not done anything to ensure that the behavior will not recur.

We therefore conclude that the trial court did not err in ruling that termination was an appropriate penalty.

V

DISPOSITION

The judgment is affirmed.  Respondents are awarded costs against Guillen.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.

18